Paul J. **FROMMERT, et al., Plaintiffs,**

v.

**Sally L. CONKRIGHT, Patricia M. Nazemetz and Lawrence M. Becker, Xerox Corporation Retirement Income Guarantee Plan Administrators and Xerox Corporation Retirement Income Guarantee Plan, Defendants.**

No. 00–CV–6311L.

United States District Court, W.D. New York.

July 30, 2004.

Robert H. Jaffe, Jaffe & Schlesinger, P.A., Springfield, NJ, for Plaintiffs.

Margaret A. Clemens, Nixon Peabody LLP, Rochester, NY, Stephanie M. Caffera, Nixon Peabody LLP, Rochester, NY, for Defendants.

## *DECISION AND ORDER*

LARIMER, District Judge.

### INTRODUCTION

Although adopted for salutary purposes, pension and other employee benefit plans have spawned much litigation over the years, particularly since the adoption of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et seq.*, in 1974.[1] This case presents one more example.

At issue in this case is the pension plan of Xerox Corporation, The plan called the Retirement Income Guarantee Plan ("RIGP" or "Plan") has already been the subject of several prior decisions of this Court[2] and other courts.[3]

The details of plaintiffs' claims will be spelled out below, but in a nutshell, they contend that the Plan administrator has wrongfully calculated the amounts of plaintiffs' benefits under the Plan. The net result of that calculation is that plaintiffs receive (or will receive, in the case of those plaintiffs who have yet to retire) hundreds, and in some cases even thousands, of dollars less per month than plaintiffs believe they should. Plaintiffs ask the Court to declare that the administrator should calculate their benefits according to plaintiffs' view of the Plan provisions.

After this Court granted defendants' motion to dismiss, in part, (*Frommert v. Conkright*, n. 1, *supra*), plaintiffs filed an amended complaint styled the First Consolidated Amended Complaint joining *Levy v. Conkright* (01–CV–6447) with this case in one complaint on behalf of roughly 100 present and former employees of Xerox. In that complaint, plaintiffs contend that defendants—the administrators of the Plan—violated various provisions of ERISA in calculating plaintiffs' retirement benefits.

---

1. For example, a Westlaw search for the term "court"—which presumably appears in every reported case—yields 2658 cases decided prior to 1974 in the Federal Pension & Retirement Benefits—Cases ("FPEN–CS") database. The same search yields 2655 cases for 2003 alone.

2. *Frommert v. Conkright,* 206 F.Supp.2d 435 (W.D.N.Y.2002); *Layaou v. Xerox Corp.,* 69 F.Supp.2d 419 (W.D.N.Y.1999); *vacated and remanded,* 238 F.3d 205 (2001).

3. *Berger v. Xerox Retirement Income Guaranty Plan,* 231 F.Supp.2d 804 (S.D.Ill.2002); *Hammond v. Xerox Corp. Retirement Income Guarantee Plan,* Appendix to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (C.D.Cal. Apr. 7, 1999) (Byrne, J.), *aff'd,* 225 F.3d 662 (9th Cir.2000); *Miller v. Xerox Corp. Retirement Income Guarantee Plan,* No. CV 98–10389 (C.D.Cal. Feb. 24, 2004) (Byrne, J.).

All the plaintiffs share this common circumstance: they were all former employees of Xerox who left, requested and received lump-sum distributions from the Pension Plan and, years later, were rehired by Xerox, which resulted in their accruing benefits again under the Plan. Some plaintiffs have retired again and object to the benefits calculated by defendants; others, probably the majority, still work at Xerox and seek a declaration now of their rights to benefits in the future.

The principal matter of contention is whether the administrators properly offset plaintiffs' prior lump-sum distributions, as enhanced, against the retirement benefits accruing as a result of the employees being rehired. Prior distributions become a factor, as an offset, because the Plan directs that all the years of service count in calculating benefits—both years before receiving the lump-sum distribution and years of service once rehired. The offset is calculated by the value of the prior lump-sum distribution plus any sum that the distribution would have earned (hypothetically) had it remained in the fund and been invested. The parties refer to this as the "phantom account" offset. For several reasons, plaintiffs object to this method of calculating benefits and seek a declaration under § 1132(a)(1)(B) that the Administrator erred in calculating benefits using this formula.[4]

Xerox has moved for summary judgment dismissing the complaint. Plaintiffs Paul Frommert and Alan Clair have cross-moved for summary judgment, although the declaratory and injunctive relief that they seek would seemingly inure to the benefit of all the plaintiffs. Frommert is

typical of those employees who, after joining this action, left Xerox's employ, and who seek additional benefits in accordance with their interpretation of the Plan. Clair is typical of the majority of the plaintiffs in this action, who are still employed by Xerox and seek a declaration clarifying the manner in which their benefits will be calculated in the future.

## FACTUAL BACKGROUND [5]

### I. Relevant Plan Provisions

An understanding of plaintiffs' claims requires some familiarity with certain Plan provisions, as well as with the Plan's various restatements and amendments over the years. The RIGP was first adopted in 1977. At all times relevant to this action, the Plan has provided that, upon retiring, an employee will receive benefits in an amount equal to the highest result of three alternative calculation methods.

The first calculation method is the retirement plan formula ("RIGP Formula"), which is a guaranteed annuity calculated by multiplying years of service (up to thirty years) by 1.4 percent of the highest-average yearly pay (defined as the average of the employee's five highest-paying calendar years with Xerox). If an employee retires early, defined as retiring after the age of 55 but before the age of 65, that person's RIGP Formula benefit is reduced by five percent for each year that he receives retirement benefits before reaching the age of 65. For rehired employees, the number of years of service includes the total time the employee worked for Xerox,

---

4. Section 1132(a)(1)(B) provides that a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan...."

5. Because the relevant facts are not in dispute, they will only be summarized here. Additional pertinent facts will be mentioned in the Discussion section as appropriate.

not just the period of employment following rehire.

The second method for calculating retirement benefits under the Plan is based on the employee's Cash Balance Retirement Account ("CBRA"), which consists of yearly contributions by Xerox of an amount equal to five percent of the employee's salary, accruing interest at a yearly fixed rate of one percent above the one-year Treasury Bill rate. For those employees who began their tenure with Xerox prior to the end of 1989, their CBRA also includes the transferred balance of a Profit Sharing Retirement Account ("Retirement Account") that Xerox maintained for each employee up until December 31, 1989.

The third calculation method under the Plan, which is only applicable to employees hired by Xerox prior to 1989, is based on the employee's Transitional Retirement Account ("TRA"). The TRA consists of the employee's transferred Retirement Account balance as of December 31, 1989, together with any increase that would have occurred if the balance had remained invested.

Because the calculation of an employee's benefits is based upon all the employee's years of service, some mechanism is needed to reflect prior lump-sum payments received by employees who, like plaintiffs, had previously left Xerox and then returned. Otherwise, the employee would receive a windfall. To that end, the Plan has, over the years, contained several provisions dealing with offsets for prior distributions. For example, the 1989 RIGP (which is the Plan that plaintiffs contend should be applied here) stated in § 9.6:

> *Section 9.6. Nonduplication of Benefits.* In the event any part or all of a Member's accrued benefit is distributed to him prior to his Normal Retirement Date, if Section 8.8 [dealing with incompetent beneficiaries] does not apply to such distribution and such Member at

any time thereafter recommences active participation in the Plan, the accrued benefit of such Member based on all Years of Participation shall be offset by the accrued benefit attributable to such distribution.

Becker Aff. Ex. F.

In 1990, the Plan was amended in several respects. Among other things, § 1.8 was amended. Prior to the 1990 amendment, § 1.8 had simply defined the CBRA as "[t]he Account established for a Member pursuant to Article 18." Becker Aff. Ex. F. Article 18 set forth the provisions governing the CBRA. The 1990 Amendment added substantial additional language to § 1.8, including the following:

> Where a Member has received a distribution from his Cash Balance Retirement Account prior to the relevant time [*i.e.*, the time as of which the calculation of an accrued benefit is determined], it shall be assumed that his actual Cash Balance Retirement Account balance at the relevant time includes an amount equal to the sum so distributed as it would have increased during the period from the time of the distribution to the relevant time if such sum had continued to be invested in the Cash Balance Retirement Account.

Becker Aff. Ex. F at 89.

The 1990 amendments also added similar language to § 1.41 of the Plan, which dealt with the TRA. Prior to being amended, § 1.41 of the 1989 Restatement had defined the TRA as "[t]he account established for a Member pursuant to Article 17." Becker Aff. Ex. F. The 1991 amendment to § 1.41 added several provisions regarding the TRA, including the following:

> Where a Member has received a distribution from his Transitional Retirement Account prior to the relevant time, it shall be assumed that his actual Transi-

tional Retirement Account balance at the relevant time includes an amount equal to the sum so distributed as it would have increased or decreased during the period from the time of the distribution to the relevant time if such sum had been invested in the General Fund, the Guaranteed Fund, the Income Fund or the Segregated Assets Fund, in whichever the Member participated at the time of the distribution.

Becker Aff. Ex. F at 106.

A new restatement of the Plan was issued in 1993. The 1993 restatement included language largely identical to that in the above amendments. *See* Becker Aff. Ex. G at §§ 1.9, 1.41. In addition, the 1993 restatement provided in § 1.45(f) that "[t]he benefit payable under this Plan to such Member who has received a prior distribution will be reduced by the previously distributed amount with adjustments to the 'relevant time' under Section 1.9 or 1.41, or at the time of the subsequent distribution under Section 4.2." Becker Aff. Ex. G.

The Plan has been restated since then, in 1996 and 1998 for example, and each restatement has included language similar to these provisions. *See* Becker Aff. Ex. H, §§ 1.40, 1.45(f); Ex. I, §§ 1.8, 1.38.

The Summary Plan Description ("SPD") also contains some discussion of the effect of prior distributions, although the wording of the SPD has changed over the years. In *Layaou v. Xerox Corp.*, 238 F.3d 205 (2d Cir.2001), the Court of Appeals for the Second Circuit held that the SPD that was in effect in 1994 and early 1995 failed to provide notice to employees that their future benefits would be offset by an appreciated value of any prior lump-sum distributions. In so holding, the court noted that

> The only relevant language in Xerox's SPD states that "[t]he amount you receive may also be reduced if you had previously left the Company and received a distribution at that time." The SPD does not mention the term "phantom account," describe the "phantom account" offset concept, or even indicate that the choice among the three methods of calculating future benefits will be made by first adding on, and then later offsetting, not the amount of the prior distributions but instead an appreciated value of the prior lump-sum distributions. Nor does the SPD offer any example of how to calculate benefits for individuals who had received prior lump-sum distributions.

*Id.* at 210.

The SPD issued in September 1995, however, contained different language concerning the effect of prior distributions. Specifically, it stated:

> It is important to note that if you have received a prior distribution from the plan, this will affect the calculation of your benefit. In calculating your RIGP benefit for the purpose of determining the highest of your TRA, CBRA, or formula benefit, the amount of your prior distribution will be added to your TRA and CBRA accounts, along with hypothetical investment gains and/or losses attributable to the prior distribution, as if the money had been left in your accounts. However, since you already received the prior distribution and there were no actual investment gains and/or losses on this amount, the payment of your RIGP benefit will not include the prior distribution or any hypothetical investment gains and/or losses.

Becker Aff., Ex. K at 10.

The 1998 SPD also set forth this concept in some detail. It stated, "If you previously received a distribution from RIGP, this prior distribution will affect future benefits payable to you under the Plan." Becker Aff., Ex. L at 51. The SPD then set forth

three steps for calculating the benefits payable to employees who had received prior distributions, as follows:

### Step 1: Calculate the *current value* of your prior distribution

To determine what the value of your accounts would have been if you had not taken a distribution, take the amount of each account at the time it was distributed to you and add the investment results the accounts would have earned had a distribution not been taken.

### Step 2: Determine the greatest total benefits

Add the current values of the CBRA and TRA that were previously distributed to any actual amounts earned since your rehire date. Using these total amounts, compare the three components—retirement plan formula, total CBRA, and total TRA—to determine the greatest benefit.

### Step 3: Reduce the greatest total benefit by the current value of the prior distribution

Your future pension payment will not include the current value of your prior distribution. The greatest total benefit calculated in Step 2 will be reduced by the current value of your prior distribution. Your future pension payment will not include the current value of your prior distribution. The remaining benefit, if any, is the amount payable to you when you leave.

Becker Aff., Ex. L at 52.

The 1998 SPD also explains the reason why prior distributions affect future benefits. It states:

> Length of benefit service is a key factor in determining retirement benefits. Calculating and including the current value of prior distributions puts employees who took a prior distribution on the same level as employees whose balances remained invested in the plan. Without this adjustment, employees who took a prior distribution could receive higher (or lower) benefits than employees who had no prior distributions. This process ensures that the Company provides the same benefit dollars for employees with the same pay and benefit service—whether or not there was a prior distribution.

Becker Aff. Ex. L at 53. The SPD then went on to provide three examples of benefits would be calculated under the TRA, CBRA, and RIGP formulas, where the employee had received a prior distribution. *Id.* at 53–54.

## II. Application of Offset Provisions to Plaintiffs

The actual operation of these Plan provisions concerning prior-distribution offsets can be illustrated by examining how they were applied to the plaintiffs in this case. As stated, the plaintiffs are all current or former employees of Xerox, each of whom worked for Xerox during two separate periods of time. During their original periods of employment, each plaintiff (with one exception, *see* n. 14, *infra*) was a participant in the Plan. Upon their initial termination of employment, each plaintiff elected to receive a lump-sum distribution of his pension benefit. The employee obviously used that distribution as he/she saw fit. Each plaintiff was later re-hired by Xerox and again became a participant in the RIGP. Under the terms of the RIGP as described above, the amount of each plaintiff's current pension benefit was (or will be) offset by the amount of the prior distribution plus any earnings which would have accrued had plaintiffs left the amount of their distribution in the Plan.

The genesis of the present dispute occurred in 1996, when plaintiffs Frommert and Clair sought clarification from Xerox of their projected future benefits. They

complained when they discovered that their projected monthly benefits would be much lower than they had expected, due to the phantom account offset.

Although the exact figures differ from plaintiff to plaintiff, in general the process by which the administrator arrived at their monthly benefits was the same with respect to all the plaintiffs. Frommert serves as a typical example.

Frommert had previously worked for Xerox from 1960 until January 1986, at which time he received a lump-sum payment of $145,780 [6] in retirement benefits.[7] Frommert Aff. (Docket #91) ¶ 9. Frommert was rehired by Xerox in November 1989.

In 1996, Frommert received his "value added" statement (an annual statement concerning an employee's benefits) from Xerox, stating that "[u]nder the RIGP formula, the monthly benefit you have earned to date, payable at age 65, is $2,482 per month." Frommert Aff. Ex. E at 6. Later that year, however, Frommert received a projection of his retirement benefits, which indicated that his actual benefit would be only $5.31 per month. Frommert Aff. Ex. F.

The retirement benefits projection, like the value-added statement, said that Frommert's monthly benefit under the RIGP formula came to $2482. His TRA and CBRA balances were listed at $504,737 and $415,394 respectively. Those figures, however, included the so-called phantom account. In other words, the administrator calculated how much Frommert's prior distribution would have grown had it remained in each of those accounts,

and then added that amount to the amount that was actually in each account. Because the TRA balance was higher, the administrator used that amount to calculate a monthly benefit, which came out to $3125.

The administrator then compared that monthly benefit with Frommert's RIGP monthly benefit. Since the $3125 TRA benefit was higher than the $2482 RIGP benefit, the administrator chose the TRA as the benefit payment method. For determining the *actual* payment amount, however, the administrator then subtracted the phantom account offset—*i.e.*, the current monthly equivalent of the prior distribution, or $3120—from the TRA monthly benefit, leaving an actual monthly benefit of $5.31. Frommert Aff. Ex. F.

On September 17, 1996, Frommert wrote a memo to defendant Patricia Nazemetz, the then-Director of Benefits at Xerox, stating that it "came as a shock" to him to discover that his projected benefit was only $5.31 per month instead of $2482. Frommert Aff. Ex. F. Xerox treated his memo as a request for additional benefits, and denied the request. In a memo to Frommert dated October 14, 1996, Kathleen Russell, Xerox's Manager, Total Pay Program Management, explained that "upon retirement, you are entitled to the higher of your RIGP Formula Benefit, your TRA or your CBRA. However, your TRA and CBRA accounts must take into consideration your prior distribution (including investment results) as if it had never left the plan." Frommert Aff. Ex. G. Frommert appealed that decision, *see* Frommert Aff. Ex. H, and the administra-

---

**6.** Unless otherwise noted, all dollar amounts are rounded off to the nearest dollar.

**7.** Although Frommert does not state how he happened to receive his benefit in a lump sum as a opposed to an annuity, the Plan in effect at that time provided that the retirement ben-

efit of a participant who terminated employment prior to reaching early retirement age would be paid in the form of an annuity, unless the participant elected to receive the benefit in another form of payment. One of the available forms of payment was a lump sum. *See* Becker Aff. Ex. D at §§ 8.1–8.5.

tor denied his appeal in November 1996. *See* Frommert Aff. Ex. I.[8]

### III. Procedural Background

Plaintiffs commenced this action on November 24, 1999, seeking clarification of their rights to future benefits. There are currently about 100 plaintiffs in this action, most of whom, as stated, are still employed at Xerox. All the plaintiffs challenge the method used to calculate the offset for prior distributions, specifically the use of the phantom account offset. Although plaintiffs recognize that the Plan, as now written, does provide for the offset, they contend that the Plan was improperly amended to include the offset provisions, and that the Court should direct the administrator to disregard those purported amendments. Defendants, on the other hand, contend that the Plan was not actually amended in this regard, because the Plan has always provided for the challenged offset, and that recent restatements of the Plan have simply provided a more detailed statement concerning the offset procedure.

The complaint asserts four separate causes of action. The first seeks relief under 29 U.S.C. § 1132(a)(1)(B), based on plaintiffs' allegation that Xerox's SPDs inadequately disclosed the phantom account offset, in violation of 29 U.S.C. § 1022. The second alleges that defendants breached their fiduciary duties by applying the phantom account offset and by not adequately disclosing the offset to plaintiffs. The third cause of action alleges that defendants' application of the phantom account offset violates 29 U.S.C. § 1053, which provides that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age," and that "[a] plan satisfies the requirements of this subparagraph if an employee who has completed at least 5 years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions." The fourth cause of action alleges that defendants amended the Plan to provide for the phantom account offset, in violation of 29 U.S.C. § 1054(g) ("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan ...."), and without proper notice under 29 U.S.C. § 1054(h).[9]

### DISCUSSION

### I. Scope of Review

The parties do not dispute that plaintiffs have exhausted their administrative remedies and now properly seek a declaration of their rights under ERISA, § 1132(a)(1)(B). Duly designated administrators of the Plan have made decisions that are adverse to these plaintiffs, and plaintiffs seek relief in this Court. The Court, then, must determine by what standard it should conduct its review of the challenged decisions.

At the outset, though, it is important to remember what this Court is *not*

---

**8.** Clair also initially inquired about his benefits in 1996, but did not challenge the administrator's calculation until 1999, when he learned that other Plan participants had retained counsel to challenge the application of the phantom account offset. *See* Clair Aff. ¶ 82 and Ex. E. His appeal was denied in August 1999. *See* Clair Aff. Ex. H.

**9. Notice of significant reduction in benefit accruals**

(1) A [pension] plan ... may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to—

(A) each participant in the plan....

empowered to do. This Court's task is not to write a "better" plan or rewrite provisions of the existing Plan. *See Henglein v. Colt Industries Operating Corp.*, 260 F.3d 201, 215 (3d Cir.2001) ("The courts are not at liberty to rewrite the terms of an ERISA plan"), *cert. denied*, 535 U.S. 955, 122 S.Ct. 1358, 152 L.Ed.2d 354 (2002); *United McGill Corp. v. Stinnett*, 154 F.3d 168, 173 (4th Cir.1998) (use of federal common law applicable to ERISA actions "is not a license to rewrite the Plan to the Court's tastes") (quoting *Health and Welfare Plan for Employees of REM, Inc. v. Ridler*, 942 F.Supp. 431, 435 (D.Minn. 1996), *aff'd*, 124 F.3d 207 (table), 1997 WL 559745 (8th Cir.1997)). Nor is it for the Court to decide whether Xerox was wise in writing the Plan as it did, or whether it *could* have come up with a "better" plan. *See Felde v. City of San Jose*, 839 F.Supp. 708, 711 (N.D.Cal.1994) ("whether or not a better plan might exist is not the issue before this court"). The operative Plan is what it is. No matter what standard of review I apply, then, the result must be governed by how the Plan *is* written, not by how it *might* have been written.

■ Defendants contend that the Court must give deference to the decision of the administrators because the Plan empowers the administrators with such discretion. The plaintiffs, on the other hand, contend that this Court's review should be more expansive and that the Court should examine the issues *de novo*.

The United States Supreme Court has ruled that issues relating to the denial of benefits must be reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 116, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Second Circuit has also stated that "[w]here the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir.1999) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).

Xerox has had several plans over the years, since 1977, and these plans, and the corresponding SPDs grant broad authority to the administrator to interpret the provisions of the Plan. For example, the 1989 Plan states at § 10.2 that "[i]n the administration of the Plan the Administrator may, subject always to the requirements of Section 10.5 [which sets for the administrator's fiduciary duties] ... [c]onstrue the Plan and the Trust Agreement thereunder...." Affidavit of Robert H. Jaffe (Docket # 89), Ex. A at 51. The 1993 Restatement contains the same language, but adds the words "and resolve any ambiguity with respect thereto" at the end. Jaffe Aff. Ex. C § 10.2(e). The same language appears in the 1998 Plan. *See* Jaffe Aff. Ex. G § 10.2(e). Similarly, the 1995 SPD states that "[t]he Plan Administrator (or designee) has the exclusive right to interpret the appropriate plan provisions; its decisions are conclusive and binding." Affidavit of Lawrence M. Becker (Docket # 96), Ex. L at 72.[10]

---

10. Although the 1993 SPD does not appear to have been submitted by either side in this case, the court in *Montesano v. Xerox Corp. Retirement Income Guarantee Plan*, 117 F.Supp.2d 147 (D.Conn.2000), *aff'd in part, vacated on other grounds in part*, 256 F.3d 86 (2d Cir.2001), quoted the 1993 SPD as containing discretion-granting language identical to that in the 1995 SPD. *See id.* at 156 ("conclu[ding] that this language is sufficient to confer discretion on the Plan Administrator ...").

The above-referenced language clearly indicates that the Administrator was intended to exercise broad discretion in making decisions relative to the Plan. Accordingly, the Court will apply the arbitrary-and-capricious standard of review in this case. *See, e.g., Ganton Techs., Inc. v. Nat'l Indus. Group Pension Plan,* 76 F.3d 462, 466 (2d Cir.1996) (applying arbitrary-and-capricious standard of review where plan documents gave trustees authority to "resolve all disputes and ambiguities relating to the interpretation of the Plan, and the application of the terms of the Plan to any circumstances and the decisions of the Board in all such matters will be final").

## II. Which Plan Document(s) Control(s)

For various reasons, which will be discussed in detail below, plaintiffs contend that the calculation of their benefits should be governed not by the Plan documents now in effect (or in effect when they most recently retired), but by the 1989 Restatement, which is no longer in effect. Alternatively, plaintiffs contend that the 1993 and 1996 Restatements (which are in most material respects identical) should control. Plaintiffs contend that these earlier restatements of the Plan do not call for the use of a phantom account offset.

■ The general rule, however, is that the plan that controls is the one that is in effect at the time that the employee applies for benefits. As the Seventh Circuit has explained in a case involving another of Xerox's benefit plans:

Since the employer can change the plan, then it must follow that the controlling plan will be the plan that is in effect at the time a claim for benefits accrues. We have held that a claim accrues at the time benefits are denied. Therefore, absent any language suggesting ambiguity on the vesting question, the controlling plan must be the plan in effect at the time the benefits were denied.

*Hackett v. Xerox Corp. Long–Term Disability Income Plan,* 315 F.3d 771, 774 (7th Cir.2003) (citations omitted). *See also Grosz–Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1160–61 (9th Cir.2001) (relevant plan documents are those in effect at the time of the denial of benefits); *Davis v. Armco, Inc.,* 169 F.Supp.2d 164, 168 (W.D.N.Y.2001) (applying plan that was in effect at time that participant retired).

■ In the case at bar, both Clair and Frommert were still employed at Xerox at the time this lawsuit was commenced in 2000. *See* Clair Aff. ¶ 3. Frommert states in his affidavit that he remained employed at Xerox until March 2002, when he was terminated as part of a reduction in force. Frommert Aff. ¶ 3. In addition, although only Frommert and Clair have actually moved for summary judgment, the declaratory relief that they seek would inure to the benefit of all the plaintiffs, and there is no indication in the complaint that any of the plaintiffs had actually sought, and were denied, increased benefits prior to the commencement of this lawsuit. Instead, it appears from the record that Frommert was the first plaintiff in this action to seek clarification of his *future* benefits, and that the other plaintiffs' similar requests were made in 1999 or later. *See* Becker Aff. Ex. M.

The fact that Frommert requested some clarification of his benefits in 1996, when the 1996 Restatement was in effect, is of no moment, since his request, and the administrator's subsequent decision, simply concerned an estimate of what his benefits would be *if* he retired at that time. The fact is that Frommert did not finally leave Xerox's employ until 2002, so the Plan in effect in 2002 is the one that ultimately governs his claim. *See Grosz–*

*Salomon,* 237 F.3d at 1160 (where benefits were denied pursuant to plan in existence at the time of the denial, fact that plaintiff had filed *claim* for benefits while earlier policy was in effect was irrelevant, since that "d[id] not entitle her to invoke that [earlier] plan's provisions in perpetuity").

■ There appears to be no dispute here that at least by 1998, and continually since then, the Plan has expressly provided for the phantom account offset exactly as it has been applied to plaintiffs. The Plan and relevant SPD could not be clearer. Even plaintiffs' counsel conceded at oral argument that defendants "finally . . . got it right" in the 1998 Restatement. Tr. at 10, lines 3–4. Specifically, §§ 1.8 and 1.38 of the 1998 Restatement provide, in pertinent part, that "[w]here a Member has received a distribution from his Member's [pre–1989] Retirement Account . . . prior to the relevant time, it shall be assumed that his actual [CBRA or TRA] balance at the relevant time includes" the phantom account, *i.e.,* an amount equal to whatever the amount of the distribution would have been had it continued to be invested in the relevant account.[11] Under the terms of the 1998 and later restatements, then, defendants' application of the phantom account offset was therefore proper.

Plaintiffs appear to recognize that, if their claims are governed by these later restatements, those claims will fail, for one of their main arguments is that the Court should disregard all amendments to the Plan after 1989, and apply the terms of the Plan as it existed in 1989. Plaintiffs contend that the 1989 Plan contained no "phantom account" provision, and, therefore, such an account should not be used in the calculation of these plaintiffs' benefits.

■ In a nutshell, plaintiffs contend that the amendments were improperly made and, therefore, ineffectual. As such, they claim that the amendments in later Plan documents have no bearing on plaintiffs' applications.

In support of their contention that the Plan was not properly amended, plaintiffs rely upon § 204(h) of ERISA, 29 U.S.C. § 1054(h). At all times relevant to this action,[12] § 204(h) provided:

> (h) Notice of significant reduction in benefit accruals
>
> (1) A [pension] plan . . . may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to—
>
> (A) each participant in the plan . . .

Plaintiffs contend that defendants did not provide such notice of any of the later amendments setting forth the application of the phantom account, and that any purported changes to the Plan after 1989 should therefore be deemed ineffective.

Defendants apparently do not dispute that they did not provide plaintiffs with written notice of the amendments in question, but they contend that notice was not required because the Plan had *always* provided for an offset for prior distributions, and that the amendments at issue simply clarified how the offset was calculated. Defendants also maintain that the amendments had no effect on the rate of plaintiffs' benefit accrual.

---

**11.** These provisions remained unchanged in the 1999 Restatement. *See* Becker Aff. Ex. J.

**12.** Subsection (h) was amended in certain respects in 2001, though it still requires that notice be given to plan participants.

As to defendants' first argument, it does appear that the phantom account offset was provided for both before and after the 1989 Restatement was issued. Prior to 1989, Xerox retirement benefits were governed by the RIGP and the "Profit Sharing Plan." While the details of the operation of the Profit Sharing Plan are not important for purposes of this Decision and Order, the 1983 Restatement (and later pre–1989 restatements) set forth a phantom account provision virtually identical to the ones challenged in the case at bar. *See* Becker Aff. Ex. C, § 1.30.

The 1989 Restatement eliminated the Profit Sharing Plan, and transferred balances under that plan to employees' TRA and CBRA accounts. Although the 1989 Restatement continued to contain a nonduplication-of-benefits provision at § 9.6, it did not expressly set forth the phantom account principle. Defendants contend, however, that the phantom account offset continued to be applied throughout the history of the Plan, and that the post–1989 amendments simply clarified this. Plaintiffs have offered no evidence to the contrary, and they have not shown that the challenged amendments actually brought about some change in how benefits were calculated, as opposed to simply explaining the method of calculation in greater detail.

Plaintiffs' argument that § 204(h) notice was required here is based on a labyrinthine, but ultimately meritless, interpretation of the various Plan amendments and restatements over the years. The main thrust of this argument is that, at certain times after issuance of the 1989 Restatement, the Plan was amended, or again restated, to provide for phantom accounting in calculating a member's CBRA and TRA balances where the member had received a prior distribution from either of *those accounts.* Plaintiffs' position is that the distributions that they received were not from the CBRA or the TRA, but from the Retirement Account, which ceased to exist as of January 1, 1989. Plaintiffs contend that not until 1997 and 1998 was language added to the Plan to specify that the offset would also apply to prior distributions from the Retirement Account. Because no notice was given of those changes in 1997 and 1998, plaintiffs argue, the addition of that language is a nullity.

There are several flaws in plaintiffs' reasoning. First, it appears to be undisputed that the Plan administrator had consistently applied the phantom account offset to *all* prior distributions, including distributions from the Retirement Account, even under the 1989 Restatement of the Plan. Plaintiffs may believe that the 1989 Restatement did not provide for such an offset, but it is important to remember here that the Court's review of the challenged decisions is not *de novo.* Rather, the administrator's interpretation of the Plan can only be overturned if it is arbitrary and capricious. *See Pagan,* 52 F.3d at 442 (courts are not free to substitute their own judgment for that of the plan administrator); *see also Miller v. United Welfare Fund,* 72 F.3d 1066, 1071 (2d Cir.1995) ("nothing in the legislative history suggests that Congress intended that federal district courts would function as substitute plan administrators . . .") (internal quotes omitted); *Miles v. New York State Teamsters Conf. Pension & Ret. Fund Employee Pension Benefit Plan,* 698 F.2d 593, 601 (2d Cir.1983) ("[w]here both the trustees of [an ERISA plan] and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control").

Given the history of the Plan, I do not believe that the administrator's consistent application of the phantom account offset can be said to be arbitrary and capricious. Participants' Retirement Account balances

were used as the starting balances for their CBRAs and TRAs as of January 1, 1989. Since the 1989 Restatement continued to provide for nonduplication of benefits, it was not unreasonable for the administrator to conclude that the phantom account offset should continue to be used as well.

Likewise, the administrator could reasonably have understood the language in the Plan referencing prior distributions from the CBRA and TRA to include distributions from the Retirement Account as well. Since a participant's Retirement Account balance formed the basis for his initial CBRA and TRA balances, it was reasonable for the administrator to conclude that the. references to offsets for prior distributions from those accounts were also intended to apply to distributions from the Retirement Account, which was the direct predecessor of the CBRA and TRA.

Plaintiffs' argument that the 1993 and 1996 Restatements should be read as applying only to prior distributions from the TRA or CBRA, and not from the Retirement Account, was also raised in *Hammond v. Xerox Corp. Retirement Income Guarantee Plan,* No. CV 97–8349 (C.D.Cal. Apr. 7, 1999) (Byrne, J.), *aff'd for reasons given by district court,* 225 F.3d 662 (table), 2000 WL 728025 (9th Cir.2000). Rejecting that argument, the *Hammond* court reasoned that "[b]ecause the balances of an employee's TRA and CBRA accounts are so closely linked to the prior distributions, if any, from an employee's Retirement Account, it was not unreasonable for the plan administrator to construe distributions from the Retirement account prior to 1989 as distributions from the TRA and CBRA accounts for 'phantom accounting' purposes under §§ 1.8 and 1.40". *Id.,* slip op. at 23. I agree with that reasoning, and follow it here as well.

Unlike the 1993 and 1996 Restatements, the 1998 Restatement expressly provided for a phantom account offset for prior distributions not only from the CBRA and TRA, but also from the Retirement Account. Plaintiffs characterize the addition of this language as an "admission against interest" on defendants' part, *see* Clair Aff. ¶ 74, apparently on the theory that this constituted an implicit recognition that the Plan had not, since 1989 at least, provided for a phantom account offset as to prior distributions from the Retirement Account. I disagree. Since, beginning with Frommert's inquiries about his benefits in 1996, it had become apparent that there was some concern among Xerox employees about the phantom account offset, it is not surprising that Xerox sought to clarify how the offset operated by making the Plan language more explicit in that regard.

■■■ I recognize that defendants cannot avoid the notice requirements of § 204(h) simply by labeling an amendment as a "clarification," if in fact the amendment has the effect of significantly reducing the rate of future benefit accrual. *See, e.g., Pickering v. USX Corp.,* 809 F.Supp. 1501 (D.Utah 1992) ("a change in the terms of a pension plan, however the change was effected or termed, can be an amendment of the plan under § 1054(h), whether implemented as a plan amendment explicitly [or as] a 'clarification'") (citing *Production and Maintenance Employees' Local 504 v. Roadmaster Corp.,* 954 F.2d 1397 (7th Cir.1992) (additional citation omitted)). The point, however, is that the Plan had consistently, and in my view not unreasonably, been interpreted by the administrator as providing for a phantom account offset for prior distributions, regardless of the source of those distributions. These various amendments and restatements, then, did not themselves reduce employees' benefits; they simply

explained the calculation of those benefits in more detail.

Furthermore, even if these amendments did insert (or reinsert) a phantom account offset that had been absent from the 1989 Restatement, they do not reduce accrued benefits, or the rate of benefit accrual. Employees' benefits under the RIGP formula continued to accrue as before. Even assuming *arguendo* that the amendments put in place an offset that was missing from the 1989 Restatement, all that the amendments did was to increase the value of an employee's TRA and CBRA balances for purposes of comparing them with the employee's RIGP accrued benefit.

This conclusion also finds support in the *Hammond* decision. In *Hammond,* a retired Xerox employee also challenged the use of the phantom account offset, on a number of grounds. The district court granted summary judgment in favor of the Plan.

In so doing, the court rejected the plaintiff's contention that the RIGP was amended to reduce his accrued benefit rights in violation of 29 U.S.C. § 1054(g) ("The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan ...."). The plaintiff based that argument on the fact that the 1989 Restatement of the Plan did not expressly set forth the phantom account concept. Instead, that concept was introduced (actually, reintroduced, since the 1983 Restatement had contained a phantom account provision) in amendments to the Plan in 1990 and 1991.

The *Hammond* court agreed with the defendant that "the challenged amendments did not reduce plaintiff's retirement benefit.... Rather than decrease plaintiff's accrued benefits under the RIGP formula, the challenged amendments simply increased the value of the TRA and CBRA components to which they [sic] RIGP formula would be compared." Slip op. at 34.

Although the court in *Hammond* was not addressing the § 1054(h) notice requirement concerning amendments that provide for a significant reduction in the rate of future benefit accrual, but rather § 1054(g)'s prohibition against amendments that decrease an already-accrued benefit, the court's reasoning is nonetheless applicable in the case at bar. The simple fact is that the challenged amendments had *no* effect, much less a "significant" one, on benefit accrual.

This case thus stands in contrast to the reported cases which have found violations of § 204(h). In those cases, the facts showed that the plans in question were amended so as to reduce the rate of benefit accrual. *See, e.g., Davidson v. Canteen Corp.,* 957 F.2d 1404, 1407 (7th Cir.1992) (employer amended pension plan to exclude income earned in exercising stock options from definition of compensation used to compute retirement benefits); *Local 504,* 954 F.2d at 1399 (employer passed a written amendment that retroactively ceased accrual of benefits under the plan); *DiCioccio v. Duquesne Light Co.,* 911 F.Supp. 880, 899 (W.D.Pa.1995) (plan administrator effected change in plan which excluded certain types of income from definition of "compensation" that was used to calculate benefit accrual); *Koenig v. Intercontinental Life Corp.,* 880 F.Supp. 372, 375 (E.D.Pa.1995) ("there is no doubt that a significant reduction [in the rate of future benefit accrual] occurred when [plaintiffs' previous employer's] plan was merged into [defendant's] plan" after defendant purchased employer from its former parent corporation).

Furthermore, it is undisputed that, even if prior notice of the amendments was not given, plaintiffs were given written notice no later than 1995, when the SPD for that year was distributed to Xerox employees. The 1995 SPD clearly informs participants

that if they received a prior distribution, then

> [i]n calculating your RIGP benefit for the purpose of determining the highest of your TRA, CBRA, or formula benefit, the amount of your prior distribution will be added to your TRA and CBRA accounts, along with hypothetical investment gains and/or losses attributable to the prior distribution, as if the money had been left in your accounts. However, since you already received the prior distribution and there were no actual investment gains and/or losses on this amount, the payment of your RIGP benefit will not include the prior distribution or any hypothetical investment gains and/or losses.

These statements could not have been clearer. *See Hammond,* slip op. at 25 ("This explanation clearly indicates that prior distributions will be *added* to the employee's retirement accounts for purposes of calculating his largest retirement benefit . . . and *subtracted back out* before the retirement benefit is actually paid").

At worst, then, Xerox provided tardy notice of the amendment to its employees, but they did receive written notice well before any of plaintiffs' retirement benefits were actually calculated. They therefore could not have suffered any prejudice as a result, and I see no reason to ignore these clear provisions. *See Burke v. Kodak Retirement Income Plan,* 336 F.3d 103, 113–14 (2d Cir.2003) (ERISA plaintiff must show "likely prejudice" in order to recover for deficient SPD), *cert. denied,* —— U.S. ——, 124 S.Ct. 1046, 157 L.Ed.2d 890 (2004).

To hold that these amendments to the Plan *never* took effect, because timely notice was not given, would also not further the purpose of § 1104(h), which is "to give plan participants 'the opportunity to take advantage of an existing benefit before it is lost.'" *Scott v. Administrative Committee of the Allstate Agents Pension Plan,* 113 F.3d 1193, 1202 (11th Cir.1997) (quoting *Davidson,* 957 F.2d at 1407). In *Davidson,* for example, the employer amended the pension plan, without adequate prior notice to employees, to exclude income earned in exercising stock options from the definition of compensation that was used to compute retirement benefits. Unaware that the plan had been amended, the plaintiff employees exercised stock options, and thereby unwittingly substantially reduced their ultimate pension benefits.

No similar circumstances exist here. Plaintiffs have proffered no evidence indicating that they did, or refrained from doing, anything based on their alleged unawareness of the phantom account offset. Moreover, the fact that most of the plaintiffs have continued to work at Xerox, years after they learned about the offset, indicates that even if they had been made aware of the offset years earlier, they would not have done anything differently (except perhaps to have commenced this lawsuit earlier).

It should also be noted that the 1995 SPD fully comports with the Second Circuit's decision in *Layaou.* The court there held that the 1993 SPD was inadequate because it did not fully explain the impact of prior distributions on benefit calculations. In so holding, the court observed that "[t]he SPD could have given sufficient notice, for example, by stating something like, 'Any future benefit will be offset by the appreciated value of any prior distribution assuming that amount remained in the plan,' or by providing an example calculating the benefits of an employee who had received a prior distribution." 238 F.3d at 211. As the court in *Miller* noted, "[t]he 1995 SPD almost mimics the Layaou Court's example" in this regard. *Miller,*

slip op. at 11. Moreover, "from 1996 onward, the Value Added Statements included with the SPD contained an actual calculation of the offset." *Id.*

I conclude, therefore, that the operative plan here is not the 1989 Restatement of the Plan. Rather, the governing Plan is the one in effect when the relevant decision is or was made—typically, the *actual* determination of a participant's eligibility for benefits, and the amount of that benefit.

Moreover, even if the Court were to assess the reasonableness of the administrator's projections or estimates of plaintiffs' future benefits in 1996 or in other prior years, those calculations should not be judged by reference to the 1989 Restatement, but by whichever Plan was in effect at the time. The evidence shows that the moving plaintiffs, Frommert and Clair, first inquired about what their benefits would be in 1996, and that after they challenged the application of the phantom account offset, their appeals were denied in 1996 and in 1999. The Plan has contained unequivocal language about the phantom account from 1993 onward, and the SPD has clearly advised employees of the phantom account offset since 1995. The reasonableness of the administrator's decisions concerning plaintiffs' benefits must therefore be judged against the Plan and SPDs as they were written at the time that plaintiffs' benefits were calculated and their appeals were denied.

### III. Plaintiffs' Claim for Additional Benefits Under 29 U.S.C. § 1132(a)(1)(B)

 Having rejected plaintiffs' contention that the Court should ignore the post–1989 amendments to the Plan, and having determined instead that the governing Plan, as to each plaintiff, is the one that was in effect at the time of the challenged decision, I also find that defendants' calcu-

lation of plaintiffs' benefits, through the use of the phantom account offset, was entirely proper and consistent with the plain language of both the Plan and the SPDs.

As stated, plaintiffs chiefly argue that the Court should ignore the various amendments dealing with the phantom account, and apply the terms of the 1989 Restatement, which, though it provided for nonduplication of benefits, did not expressly set forth the concept of the phantom account. For the reasons stated above, I have rejected that argument.

In the alternative, however, plaintiffs ask the Court to enforce the terms of the 1993 and 1996 Restatements of the Plan, excluding any subsequent amendments to the Plan.[13] *See* Plaintiffs' Notice of Motion for Summary Judgment at 2. According to plaintiffs, the 1993 and 1996 Restatements, though they do contain provisions dealing with offsets, do not provide for a phantom account offset as to plaintiffs.

This argument is meritless. I see no reason why, having rejected plaintiffs' argument that the 1989 Restatement was improperly amended, the Court should decide that the 1993 and 1996 Restatements should govern plaintiffs' claims, even if the challenged decisions were made after subsequent restatements had been issued. Simply because (according to plaintiffs) application of the 1993 and 1996 Restatements would benefit plaintiffs is no reason to ignore later restatements of the Plan. Furthermore, to apply those plans would be contrary to the general rule that the controlling plan is the one in effect at the time of the challenged decision.

### IV. Plaintiffs' Other Claims

For many of the same reasons already given, I also find that defendants are enti-

---

13. According to plaintiffs, the terms of the 1993 and 1996 Restatements do not differ in any material respects with regard to the offset provisions.

tled to summary judgment on plaintiffs' claims for breach of fiduciary duty, and their claims under §§ 1053 and 1054. First, my findings that the Plan was properly amended, and that notice of the challenged amendments was not statutorily required, disposes of plaintiffs' claim under 29 U.S.C. § 1054(h).

■ I also find that plaintiffs' claim under § 1054(g), which provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan ...," must be dismissed as well. As the court stated in *Hammond*, "the challenged amendments did not reduce plaintiff's retirement benefit.... Rather than decrease plaintiff's accrued benefits under the RIGP formula, the challenged amendments simply increased the value of the TRA and CBRA components to which they [sic] RIGP formula would be compared." Slip op. at 34.

■ For similar reasons, I also grant defendants' motion as to plaintiffs' forfeiture claim under § 1053(a)(2). That section provides that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age...." In addition, the plan must provide that any employee who has completed at least five years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions.

This claim is little more than a restatement of plaintiffs' other claims, inasmuch as it, too, is premised on plaintiffs' allegation that defendants wrongfully applied the phantom account offset when calculating plaintiffs' benefits. As explained, this did not reduce plaintiffs' accrued benefits, and no forfeiture occurred. *See Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 512–17, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981) (ERISA's nonforfeiture provisions did not prohibit offset of pension benefits

by workers' compensation awards; "the statutory definition of 'nonforfeitable' assures that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or a method for calculating the benefit"); *Hammond*, slip op. at 30 ("Although *Alessi* dealt with the question of whether benefits derived from sources external to the pension plan could be offset against amounts owed under the plan, its basic observations are even more compelling where previously distributed benefits under the plan itself are offset"). The purpose, and effect, of the offset is not to take away an earned benefit, but only to prevent a windfall to participants, which is exactly what would happen if prior distributions were ignored. *Hammond*, slip op. at 24.

■ Plaintiffs' remaining claim, for breach of fiduciary duty, must be dismissed as well. Although the complaint (perhaps artfully) avoids citing a statutory basis for this claim, but instead characterizes it as based on "common law principles applicable to trusts and fiduciaries ...," Complaint ¶ 111, this is essentially a claim under 29 U.S.C. § 1132(a)(3), which provides that a civil action may be brought for broad injunctive or equitable relief. *See Varity Corp. v. Howe*, 516 U.S. 489, 510, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Burstein v. Retirement Account Plan For Employees of Allegheny Health Educ. and Research Foundation*, 334 F.3d 365, 384 (3d Cir.2003).

The Court has already dismissed plaintiffs' claims under that section, however, on the ground that all of the relief requested by plaintiffs could adequately be addressed under § 1132(a)(1)(B). *See Frommert*, 206 F.Supp.2d at 439. Plaintiffs cannot avoid that ruling simply by recasting this as a claim under unspecified "common law principles," and it is dismissed for the reasons given in this Court's prior de-

cision. *See Varity Corp. v. Howe*, 516 U.S. 489, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) ("where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate'"); *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir.2004) ("when relief is available under section 1132(a)(1), courts will not allow relief under § 1132(a)(3)'s 'catch-all provision'").

 I add, however, that this claim, which is based largely on defendants' alleged failure to disclose the existence of the phantom account offset, is meritless as well. All the Plan participants were apprised of the offset no later than the issuance of the 1995 SPD, which, as Judge Byrne noted in *Miller*, "almost mimic[ked]" the Second Circuit's example of sufficient notice. *Miller*, slip op. at 11. Accordingly, this claim is untimely, since the original complaint in this action was filed in November 1999. *See* 29 U.S.C. § 1113(2) (three-year statute of limitations applies to breach of fiduciary duty claims, commencing on earliest date that plaintiff had actual knowledge of breach). In addition, plaintiffs have failed to present any evidence of "likely prejudice" from the previous inadequate disclosures. They have not indicated what they would have done differently had they been apprised of the offset sooner, nor is there any evidence that plaintiffs sought to change their employment when they did find out about the offset. Indeed, it appears that most of the plaintiffs are *still* employed at Xerox. *See Miller*, slip op. at 12 (observing that there was no evidence that plaintiffs sought to switch their employment after their receipt of the 1995 SPD).[14]

## CONCLUSION

The motion for summary judgment (Docket # 88) brought by plaintiffs Paul J. Frommert and Alan H. Clair is denied.

Defendants' motion for summary judgment (Docket # 95) is granted, and the complaint is dismissed.

IT IS SO ORDERED.

---

14. Plaintiff Lawrence R. Holland has at all relevant times been an hourly (*i.e.*, non-salaried) Xerox employee, and apparently has never been a participant in the RIGP. For reasons that are not entirely clear, however, he contends that his retirement benefits are governed by the same provisions applicable to the other plaintiffs. Since Holland is not a moving plaintiff, and because I am dismissing the complaint, it is unnecessary for the Court to decide whether Holland's status as a non-salaried employee bars his claims for relief.