Paul J. FROMMERT and Alan H. Clair Plaintiffs–Appellants,

Donald S. Foote, Thomas I. Barnes, Ronald J. Campbell, Frank D. Commesso, William F. Coons, James D. Gagnier, Brian L. Gaita, William J. Ladue, Gerald A. Leonardo Jr., Frank Mawdesley, Harold S. Mitchell, Walter J. Petroff, Richard C. Spring, Patricia M. Johnson, F. Patricia M. Tobin, Nancy A. Revella, Anatoli G. Puschkin, William R. Plummer, Michael J. McCoy, Larry J. Gallagher, Napolean B. Barbosa, Alexandra Spearman Harrick, Janis A. Edelman, Patricia H. Johnston, Kenneth P. Parnett, Joyce D. Cathcart, Floyd Swaim, Julie A. McMillian, Dennis E. Baines, Ruby Jean Murphy, Matthew D. Alfieri, Kathy Fay Thompson, Mary Beth Allen, Craig R. Spencer, Linda S. Bo-

urque, Thomas Michael Vasta, Frank C. Darling, Clark C. Dingman, Carol E. Gannon, Joseph E. Wright, David M. Rohan, David B. Ruddock, Charles Hobbs, Charles Zabinski, Charles J. Maddalozzo, Joyce M. Pruett, William A. Craven, Maureen A. Loughlin Jones, Kenneth W. Pietrowski, Bonnie Cohen, Lawrence R. Holland, Gail A. Nasman, Steven D. Barley, Donna S. Lipari, Andrew C. Matteliano, Michael Horrocks, Candice J. White, Kathleen E. Hunter, John L. Crisafulli, Deborah J. Davis, Brenda H. McConnell, Kathleen A. Bowen, Robert B. Carrando, Terence J. Kurtz, William J. Cheslock, Thomas E. Dalton, Lynn Barnsdale, Bruce D. Craig, Gary P. Hardin, Sr., Claudette M. Long, Dale Platteter, Mary Ann Sergeant, Molly White Kehoe, Irshad Quershi, David K. Young, Leslie Ann Wunsch, Eugene H. Updyke, Michael R. Benson, Alvin M. Adams, Ronnie Kolniak, James J. Farrell, Robert L. Brackhahn, Benjamin C. Roth, Richard C. Carter, Carmen J. Sofia, Kathleen W. Levea, Frederick Scacchitti, Paul Defina, James G. Walls, Gail J. Levy, John A. Williams, Crystal Thorton, Charles R. Drannbauer, William M. Burritt, Janice Ross Heiler, Thomas F. McGee, Vincent G. Johnson, F. Colt. Hitchcock, Ronnie Tabak, Martha Lee Taylor and Richard J. Glikin, Plaintiffs,

v.

Sally L. CONKRIGHT, Xerox Corporation Pension Plan Administrator, Patricia M. Nazemetz, Xerox Corporation Pension Plan Administrator, Xerox Corporation, Lawrence M. Becker, Xerox Corporation Plan Pension Plan Administrator, Xerox

Corporation Retirement Income Guarantee Plan and Xerox Corporation, a New York Corporation, Defendants–Appellees.

Docket No. 04–4609–CV.

United States Court of Appeals, Second Circuit.

Argued: July 11, 2005.

Decided: Jan. 6, 2006.

Robert H. Jaffe, Esq., Robert H. Jaffe & Associates, P.A., Springfield, N.J., for Plaintiffs–Appellants.

Margaret A. Clemens, Esq., Ryan T. Jenny, Esq., Nixon Peabody L.L.P., Rochester, N.Y, for Defendants–Appellees.

Before: POOLER and SACK, Circuit Judges, and GARAUFIS,[1] District Judge.

GARAUFIS, District Judge.

Plaintiff-appellants appeal from a June 3, 2002 grant of partial dismissal and from a July 30, 2004 grant of summary judgment entered in the United States District Court for the Western District of New York (David G. Larimer, *Chief Judge*) in favor of Xerox Corporation ("Xerox")[2], the Xerox Corporation Retirement Income Guarantee Plan ("the Plan"), and individually named Plan Administrators dismissing the plaintiffs' claims for improper calculation of their benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1101 *et seq. Frommert v. Conkright,* 206 F.Supp.2d 435 (W.D.N.Y.2002) *("Frommert 2002"); Frommert v. Conkright,* 328 F.Supp.2d 420 (W.D.N.Y.2004) *("Frommert 2004").* The central issue in this appeal is whether the manner in which the defendants instituted a "phantom account" offset, through which the hypothetical growth of an employee's previous lump sum retirement benefits distribution is factored into his current benefits calculation, violates ERISA. We hold that it does.

For the reasons set forth below, we find that the Plan has not always contained a phantom account, that it was not properly

---

1. The Honorable Nicholas G. Garaufis, United States District Court for the Eastern District of New York, sitting by designation.

2. Xerox was dismissed as a defendant in the first of the district court's rulings. Plaintiff-appellants do not appeal this dismissal.

added to the Plan through amendment until 1998, that its application to employees rehired prior to 1998 violates ERISA's anti-cutback provision by impermissibly reducing their benefits, and that its adoption in 1998 was made without proper notice to Plan participants. We also conclude that in light of our view of the applicable law set forth below, the district court should reassess whether the plaintiffs have stated a claim for equitable relief concerning their allegations that the defendants breached their fiduciary duties by misrepresenting the terms of the Plan. We therefore vacate the district court's decision granting summary judgment to the defendants and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Plaintiffs are a group of over 100 Xerox employees who left the company at one time or another and were subsequently rehired. At the time of their initial departure from Xerox, they received lump-sum distributions of the retirement benefits they had earned to date. Upon being rehired by Xerox, they once again began to earn retirement benefits under the Plan. The dispute in this case centers on the manner by which the rehired employees' previous distributions are factored into the calculation of their retirement benefits after returning to Xerox.

Under Xerox's retirement plan, a retiring employee's benefits are determined by looking to the highest result of three alternative calculation methods. *See Layaou v. Xerox Corp.,* 238 F.3d 205, 206 (2d Cir. 2001). The first of these methods is the retirement plan formula ("RIGP"), which is calculated by multiplying years of service, up to thirty, by 1.4 percent of the highest-average yearly pay, a figure based on the average of the employee's five highest-paying calendar years with Xerox.

For employees rehired by Xerox, the number of years of service includes the total time the employee worked for Xerox, not just the period of employment following rehire.

Second, the Plan looks to the employee's Cash Balance Retirement Account ("CBRA"), which consists of yearly contributions by Xerox of an amount equal to five percent of the employee's salary. This account accrues interest at a yearly fixed rate of one percent above the one-year Treasury Bill rate. For employees who commenced working at Xerox before the end of 1989, the CBRA account also includes the transferred balance of a Profit Sharing Retirement Account that Xerox maintained for each employee until December 31, 1989. According to the record, the transferred balance for the plaintiffs was $0 because they had withdrawn the balance of their accounts when they originally retired from Xerox.

The third and final method of calculation is called the Transitional Retirement Account ("TRA") and is only available to employees hired by Xerox prior to 1989. It consists of the balance, if any, that an employee had in the Retirement Account as of December 31, 1989, plus hypothetical gains based on the investment results of the funds in which the employee's Profit Sharing Retirement Account were invested as of that date.

In order to avoid paying duplicative benefits to rehired employees who had previously received a lump sum distribution, the Plan has always contained provisions concerning the offset of prior distributions. Without such provisions, rehired employees would receive a windfall upon their second departure from Xerox because they would receive benefits based on their initial tenure at the company on two separate occasions. It is the manner by which the offset of prior distributions is applied,

along with the means by which it was incorporated into the Plan, that are the central subjects of dispute in this case.

The Plan's 1989 Restatement reflects a significant redesign of the pension benefit scheme previously employed by Xerox. Most notably, the Plan eliminated the Profit Sharing Plan and transferred balances within it to employees' TRA and CBRA accounts. Before 1989, TRA and CBRA accounts did not exist. The Plan provided for an individual to have a retirement account and also included a calculation somewhat similar to the RIGP formula described above (total years of service multiplied by percentage of average monthly compensation). The main difference, however, was that, in determining benefits, the Plan did not compare the monthly value of the RIGP calculation to the monthly value of the individual's retirement account. Instead, to determine benefits, a certain percentage of the individual's retirement account was deducted from the RIGP to offset the earlier lump-sum distribution.

The 1989 Restatement also contained provisions regarding the non-duplication of benefits for plan participants, who are referred to as "Members." In particular, Section 9.6 of the Restatement provided as follows:

> *Nonduplication of Benefits.* In the event any part of or all of a Member's accrued benefit is distributed to him prior to his Normal Retirement Date, if Section 8.8 [dealing with incompetent beneficiaries] does not apply to such distribution and such Member at any time thereafter recommences active participation in the Plan, the accrued benefit of such Member based on all Years of Participation shall be offset by the ac-

crued benefit attributable to such distribution.

The term "Accrued Benefit" as used in Section 9.6 is defined in Section 1.1 of the 1989 Restatement in pertinent part as follows:

> The normal retirement benefit which a Member has earned up to any date, and which is payable at Normal Retirement Date in an amount computed in accordance with ... [Section] 4.3, based, however, only upon Average Monthly Compensation received and Years of Participation rendered by a Member up to the date as of which the Accrued Benefit is computed ...

Of further relevance concerning the non-duplication of benefits is Section 1.44 of the Restatement, concerning "Years of Participation." Section 1.44f provides: "No credit shall be given for any period with respect to which a lump sum payment has been made under Sections 8.5 and 8.8." Section 8.5 addresses lump sum distributions of benefits of the type received by the plaintiffs, while Section 8.8 deals with an issue unrelated to this case—the procedures to be followed if a plan participant or her spouse are adjudged incompetent.

As the defendants conceded at oral argument, as well as in their submissions to the Court[3], the 1989 Restatement did not specify how the Plan would account for the prior distributions of the newly created CBRA and TRA accounts, and, more significantly, made no mention of the phantom account offset or the fact that the hypothetical increased value of the prior distribution would be factored into the calculation of a rehired employee's benefits. The defendants, however, contend that a series of subsequently issued changes and

---

**3.** *See, e.g.,* Defendants–Appellees' Brief at 35 (indicating that "the initial draft of the 1989 Restatement did not specify how to account for the prior distributions of the newly created CBRA and TRA accounts").

clarifications provided notice of the existence of the phantom account to Plan participants and sufficient explanation of the manner in which it functions.

On April 2, 1990, the defendants issued two changes to the Plan's text without prior notice to Plan participants. The April 2 changes added language to the definitions of the CBRA and TRA accounts to allow offsets for distributions made after these accounts were included in the Plan. Notably, the only reference to the treatment of prior lump sum distributions from the then-defunct Retirement Account related to when a plan participant had been the subject of a qualified domestic relations order. The other significant change affected Section 4.3 and provided that a Plan participant was entitled only to the larger of the RIGP benefit or the monthly benefit based on her CBRA and TRA account balance, if any.

The Plan's 1993 Restatement changed Section 1.44f, now titled Section 1.45f, and added two additional sentences. In the 1989 Restatement, Section 1.44f read: "No credit shall be given for any period with respect to which a lump sum payment has been made under Sections 8.5 or 8.8." This language was modified in Section 1.45f of the 1993 Restatement to provide:

> No credit shall be given for any period with respect to which a lump sum payment has been made under Section 8.2, 8.5 or 8.8. Credit for Years of Participation preceding a payment under Sections 8.5 and 8.8 will be reinstated if a Member again becomes an Active Member. The benefit payable under this Plan to such Member who has received a prior distribution will be reduced by the previously distributed amount with adjustments to the "relevant time" under

Section 1.9 [CBRA]1.41 [TRA], or at the time of the subsequent distribution under Section 4.2 [formerly Section 4.3].

Section 8.2 deals with payments or distributions of the type received by the plaintiffs.[4] Thus, its inclusion within Section 1.45f meant that the type of distributions made to the plaintiffs were brought within the scope of Section 1.45f's coverage. However, because Section 8.2 is omitted from the second sentence of 1.45f, the distributions provided under Section 8.2 are, by the terms of the Plan, excluded from reinstatement if an employee is rehired.

In 1995, the defendants issued a "Benefits Update" summarizing changes made to the Plan since the issuance of the 1993 Restatement and offering "clarification of key points about the plans." Among these clarifications was a description of the manner in which the phantom account offset functioned. This explanation read as follows:

> It is important to note that if you have received a prior distribution from the plan, this will affect the calculation of your benefit. In calculating your RIGP benefit for the purpose of determining the highest of your TRA, CBRA, or formula benefit, the amount of your prior distribution will be added to your TRA and CBRA accounts, along with hypothetical investment gains and/or losses attributable to the prior distribution, as if the money had been left in your accounts. However, since you already received the prior distribution and there were no actual investment gains and/or losses on this amount, the payment of your RIGP benefit will not include the prior distribution or any hypothetical investment gains and/or losses.

---

**4.** Section 8.5 of the 1993 Restatement concerned distributions under $3,500, while Section 8.8 continued to address procedures for the payment of pension benefits to incompetent or minor plan participants or beneficiaries.

In the 1996 Restatement, the language of 1.45f remained substantially unchanged. However, on July 9, 1997, the Plan administrators issued a document altering the language of 1.45f of the 1996 Restatement to include Section 8.2 within the second sentence: "No credit shall be given for any period with respect to which a lump sum payment has been made under Sections 8.2 and 8.5. Credit for Years of Participation preceding a payment under Sections 8.2 and 8.5 will be reinstated if a Member again becomes an Active Member." This change had the effect of including the prior lump sum distributions under 8.2 into consideration of the accrual of rehired employees' benefits.

Xerox's benefits department distributed an internal memorandum dated May 21, 1997 in advance of a "communication" distributed to rehired employees entitled "Important Information For Rehired Employees Regarding Your RIGP Benefits." The internal memorandum advised that the communication was intended to "help reinforce employees' understanding of prior distributions under the Xerox Retirement Income Guarantee Plan (RIGP)." The communication itself indicated that it was provided to supplement the prior distribution explanation provided in the 1995 Benefits Update and "clarify how your prior distribution will affect future benefits payable to you under the plan."

As the plaintiffs concede, the details of the phantom account offset functions were set out in full in the 1998 Summary Plan Description ("SPD"). The SPD explained: "Your future RIGP benefit must take into account the current value of this prior distribution, as if it had remained in your account and experienced investment results. This ensures the same retirement funding levels for all employees—whether or not they had taken a prior distribution." The SPD also explained in some detail the mechanics of the three-step process by which the phantom account is factored into benefit calculations. First, the present value of any of the employee's accounts are calculated as if the lump sum had remained in the account and been invested throughout the period following distribution. Second, the current values of the CBRA and TRA that previously were distributed (i.e., the estimated values) are added to any actual amounts earned since the employee's rehire date.[5] Using these total amounts, a comparison is made among the three account values—RIGP, total CBRA, and total TRA—to determine which method yields the greatest benefits in a monthly value. Third, the account with the greatest monthly value is reduced by the current value of the employee's prior distribution in that same account.[6]

The 1998 Restatement also contained language addressing the fact that a rehired employee's CBRA and TRA accounts will be offset by the hypothetical growth of previous distributions. The sections defin-

---

**5.** The RIGP benefit is not subject to the same estimation process because it is based strictly on the formula of the employee's average salary and years of service. This is because there is no actual account balance for the RIGP at the second date of termination, and there also is no current value of prior distribution. Thus the phantom account offset is applied to the RIGP value only by way of comparison with the CBRA and TRA account values. *See* Plaintiffs–Appellants' Brief, Appendix Vol. V, at A–1522–1525.

**6.** Because the RIGP account does not undergo the same estimated appreciation as the TRA and CBRA accounts, *see* n. 4 *supra*, there is no phantom account value to offset in this third stage. Instead, when the RIGP formula provides the greatest potential value, the second highest value (either the TRA or CBRA) is subtracted out from the RIGP value to yield an actual monthly benefit rate. *See* Plaintiffs–Appellants' Brief, Appendix Vol. V, at A–1525.

ing the CBRA and TRA both provided that when a rehired employee's benefits are calculated these accounts will be treated as if they contain the previous distribution made to the plan participants as "it would have increased [had it remained invested] during the period from the time of the distribution to the relevant time."

The experience of plaintiff Paul Frommert demonstrates the manner in which the use of the phantom account was both disclosed and utilized. Frommert worked at Xerox from 1960 until January 1986, when he received a lump-sum payment of $147,780.[7] Frommert was then rehired by Xerox in November 1989. In 1996, Frommert received a document from Xerox entitled "Value Added: Your 1996 Total Pay Statement" informing him that under the RIGP formula, the monthly benefit he had earned to date, payable at age 65, was $2,842 per month. The "Value Added" statement also provided the following information regarding the RIGP benefit: "Your benefit will grow with your service and earnings. It will be reduced if you've had a prior distribution ..." (emphasis in original). In a footnote, it was also noted that the current value of prior distributions, taking into account hypothetical gains, would be used "in calculating your RIGP benefit for the purpose of determining the highest of your TRA, CBRA, or formula benefit."

On May 29, 1996, however, Frommert received a "Projected RIGP Calculation" that took into account the phantom account offset and estimated his benefit at only $5.31 a month. This value was arrived at using total TRA and CBRA balances of $504,737 and $415,394 that included the hypothetical growth of the phantom account. Because the TRA value was higher than the CBRA value, it was used to calculate the monthly benefit, which

came out to $3,125. The TRA monthly value was then compared to the RIGP monthly value of $2,482 and because it was larger, it was adopted as the benefit payment method. But to determine the *actual* monthly amount Frommert was to receive, the phantom account offset still had to be deducted from the TRA monthly amount. The current monthly equivalent of the prior distribution was determined to be $3,120. After deducting this amount from the total TRA monthly benefit of $3,125, Frommert was left with a $5.31 monthly pension benefit.

Upon learning of his expected level of benefits based on the inclusion of the phantom account, Frommert sent a memorandum to Patricia Nazemetz, Director of Benefits at Xerox. Frommert indicated that learning his expected benefits were only $5.31 per month "came as a shock since I believed the number in the value added statements year over year." Xerox construed Frommert's memorandum as a request for additional benefits, which it denied in an October 14, 1996 memorandum. Xerox's memorandum explained that "based upon the RIGP Plan Document as written, upon retirement, you are entitled to the higher of your RIGP Formula Benefit, your TRA or your CBRA. However, your TRA and CBRA accounts must take into consideration your prior distribution (including investment results) as if it had never the left plan." Frommert was also informed that he could request that the Plan Administrator review the denial of additional benefits. Frommert subsequently appealed the denial of benefits. That appeal was denied on November 26, 1999.

On November 24, 1999 the plaintiffs commenced this lawsuit in the Western District of New York. The defendants

---

7. Unless otherwise indicated, all dollar figures are rounded to the nearest dollar.

moved for dismissal of a number of the plaintiffs' claims and, in a decision dated June 3, 2002, the district court granted the motion in part by dismissing a number of counts, one cause of action under ERISA, and Xerox as a defendant. The defendants subsequently moved for summary judgment and plaintiffs Paul Frommert and Alan Clair cross moved for summary judgment. In a decision dated July 30, 2004, the district court denied the plaintiffs' cross-motion and granted the defendants' motion in its entirety, thereby dismissing the complaint.

Plaintiffs now appeal the district court's grant of summary judgment along with the district court's decision to dismiss their claim for equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a).

## II. DISCUSSION

We review the district court's determinations on motions to dismiss and summary judgment *de novo*. *See, e.g., Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.2003). In reviewing the grant of a motion to dismiss, we must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir.2002). "The court may not dismiss a complaint unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997) (internal quotation marks omitted). Summary judgment is appropriate only where the moving party has demonstrated that there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law. *Miller*, 321 F.3d at 300.

### A. The Phantom Account—Effect and Implementation

"There is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them." *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004). Here, that objective was thwarted up until 1998 because the defendants attempted to implement the phantom account offset without properly amending the terms of the Plan or providing adequate notice to rehired employees that their benefits would be reduced because of the hypothetical growth attributed to their prior lump sum distributions. Without the benefit of such information, former employees contemplating returning to Xerox were denied the opportunity to make a meaningful decision regarding whether they would accept the terms of Xerox's pension plan. Not until 1998, when the phantom account was fully explained in an SPD, was the text of the Plan amended and adequate information provided to former Xerox employees concerning the treatment of their previous distributions. Such belated disclosure of so significant a change cannot be squared with ERISA's mandate.

At the outset, we pause to define what it means to "amend" a plan under ERISA. We do so because of the crucial role that this definition will have in determining (1) whether Plan participants received timely notice of the amendment and (2) which Plan participants may be bound by the amended Plan. Both the district court and the defendants view an amendment as occurring simply when the plan administrators change the operation of the plan. We, however, look to the plain meaning of the term and define an "amendment" to a plan as taking place at the moment when employees are properly

*informed* of a change. Because we conclude that an ERISA "amendment" to a plan occurs only when the plan's employees are informed of a change in the text of the plan, the defendants' argument that an amendment may be made by plan administrators changing the operation of the plan has no merit.

Two ERISA provisions are also of central importance in analyzing the legitimacy of the phantom account offset at issue here. Congress adopted these provisions to safeguard benefits that have been promised to employees. First, ERISA's anti-cutback rule protects employees' expectations in their accrued benefits. It provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1).[8] Second, under ERISA § 204, plan sponsors are prohibited from amending a plan in a way that reduces future benefit accrual without proper notice to plan participants. Section 204(h), as then constituted, provided as follows:

> (h) Notice of significant reduction in benefit accruals
>
> (1) A [pension] plan ... may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to-

> (A) each participant in the plan ...

29 U.S.C. § 1054(h) (2000).[9]

■ The district court denied the plaintiffs relief under both of these provisions, finding: (1) that the phantom account did not actually reduce the plaintiffs' accrued benefits; (2) that the plan that controls an employee's benefits is the one in effect at the time of the application for benefits; (3) that the Plan had always provided for the use of the phantom account offset; and (4) that, even if the phantom account did reduce the plaintiffs' benefits, they received sufficient "tardy" notice under § 204(h). We disagree with each of these conclusions and find, as a matter of law, that the phantom account was not part of the Plan until 1998 when it was added by amendment of the Plan's text through its explanation in the 1998 SPD. Based on this finding, we hold that application of the phantom account by the defendants prior to its inclusion in the Plan by amendment constituted a prohibited reduction of justified expectations of rehired employees' accrued benefits in contravention of § 204(g).[10] We also hold that the defendants failed to meet their obligations to provide advance notice of the amendment as required by § 204(h), meaning that the phantom account may not be applied to employees rehired prior to the issuance of the 1998 SPD. However, for employees rehired subsequent to the amendment of the Plan through the 1998 SPD, the phantom account is a component of the Plan that they joined and thus may permissibly be applied to them.

---

**8.** Section 204(g)(1) contains two exceptions not applicable here—allowing the reduction of accrued benefits by amendment where a place faces "substantial business hardship," 29 U.S.C. § 1082(c)(8), and where terminated multiemployer plans are involved, § 1441.

**9.** Section 204(h) was amended in 2001. *See* Pub.L. 107–16, § 659(b).

**10.** We do not reach the issue of the plaintiffs' anti-forfeiture claim under ERISA § 203(a)(2), 29 U.S.C. § 1053(a)(2), because we find that it is duplicative of their anti-cutback claim.

### 1. Origins of the Phantom Account

The initial question before us is whether the application of the phantom account represents an amendment to the Plan. Because ERISA does not set the level of benefits that a plan must provide, *Lockheed Corp. v. Spink*, 517 U.S. 882, 887, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), the use of the phantom account is problematic only if it represents an impermissible amendment to the terms of the Plan. *See* ERISA § 204(g)-(h), 29 U.S.C. § 1054(g)-(h). That is, if the phantom account has always been a part of the Plan, as the defendants contend, then its application to the plaintiffs does not constitute a new occurrence subject to challenge under § 204(g), nor would it violate § 204(h) because there would have been no amendment.

The district court upheld the validity of the phantom account in part because it erroneously concluded that the controlling plan for the purpose of determining benefits is the one in effect at the time of an employee's application for benefits. *See Frommert 2004*, 328 F.Supp.2d at 431. Although this is true for welfare benefit plans, it is not the case where, as here, pension benefits are involved. *See Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 491 (2d Cir.1988) ("ERISA regulates pension plans far more extensively than welfare plans. For example, welfare plans are expressly exempted from the Act's detailed minimum participation, vesting and benefit-accrual requirements . . ."); *Owens v. Storehouse, Inc.*, 984 F.2d 394, 397–98 (11th Cir.1993) ("ERISA does not prohibit a company from terminating previously offered benefits that are neither vested nor accrued. Unlike pension benefits, welfare benefit plans neither vest nor accrue.") (internal citation omitted); *see also* J. Langbein & B. Wolk, *Pension and Employee Benefit Law* 160 (3d ed. 2000) ("Langbein & Wolk") ("ERISA's vesting and benefit accrual rules apply to pension plans, but not to welfare benefits plans."). The reason that a later-adopted plan cannot be applied to reduce already-earned pension benefits is that these benefits are protected by ERISA's vesting and accrual provisions. *See* ERISA § 203–204, 29 U.S.C. § 1053–1054. Absent such requirements, ERISA would provide minimal protection for employees who would lack any certainty that the benefits they expected to receive upon retirement would actually be available to them and not be eliminated by the later adoption of a less favorable plan. Because ERISA does not contemplate such an approach of substituting the terms of later plans for the purpose of calculating accrued benefits upon retirement, if the phantom account is to be considered part of the Plan, then there must be another means by which this can occur.

In this regard, the defendants contend, and the district court agreed, that the phantom account has always been part of the Plan. Despite its absence from the 1989 Restatement, which both the defendants and district court acknowledge, the defendants argue that the Plan contained the phantom account both before and after the 1989 Restatement. Specifically, the defendants contend that the phantom account was present in versions of the Plan prior to the 1989 Restatement and that its omission from the 1989 Restatement was rectified by the changes made to the Plan in 1990 and through subsequent disclosures regarding how the Plan functions. Further, the defendants argue that because the 1989 Restatement contained a nonduplication provision, its only flaw was that it lacked sufficient details concerning how this nonduplication would occur— through the phantom account. They argue that this oversight was quickly rectified by changes to the Plan that clarified that the phantom account would be the

means of ensuring nonduplication in sufficient detail to apprise Plan participants of its existence along with later SPDs detailing the manner in which it functions. Implicit in this approach is an assumption that material terms of a plan may be omitted from a plan for significant periods only to surface later and be given binding effect for the period prior to their absence. We do not share this view.

This· Court has previously considered the effectiveness of the Plan's purported disclosures of the phantom account to employees through its SPDs, and found them to have been wanting. *See Layaou,* 238 F.3d at 209–212. The defendants take pains to distinguish this case from *Layaou* on the grounds that *Layaou* involved a challenge under a different provision of ERISA, and that Layaou retired prior to the full disclosure of the mechanics of the phantom account. However, they cannot overcome *Layaou*'s significance for this case. We view *Layaou* as having settled the question of whether the Plan had sufficiently disclosed the existence and mechanics of the phantom account at any point before 1994.

Like the plaintiffs here, Layaou had previously been employed by Xerox and taken a lump-sum distribution at the time of his first separation from Xerox. *Id.* at 206. Layaou was rehired in 1987 and subsequently retired in 1995, when the phantom account was applied to his benefit calculation and reduced his expected benefits from $924 under the RIGP formula to $124 under the CBRA. *Id.* at 207. The only notice that Layaou had received concerning the non-duplication of his benefits was contained in Xerox's annual SPD, which simply provided that "[t]he amount you receive may also be reduced if you had previously left the Company and received a distribution at that time." *Id.* at 210. Nowhere did the SPD address the issue of a phantom account or explain that Layaou's benefits would be offset by a hypothetically appreciated value of his prior lump-sum distribution. *Id.* As a result, we held that the Plan. violated ERISA's SPD requirement, 29 U.S.C. § 1022, by failing to "provide notice to Layaou and other similarly situated employees that their future benefits would be offset by an appreciated value of their prior lump-sum benefits distributions." *Id.*

■ Even though the instant case does not involve a challenge under § 1022, the holding in *Layaou* is of significance here because of the central role that the SPD plays in communicating the terms of a plan to its members. "ERISA 'contemplates that the summary [plan description] will be an employee's primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary." *Layaou,* 238 F.3d at 209 (quoting *Heidgerd v. Olin Corp.,* 906 F.2d 903, 907 (2d Cir.1990)) (alteration in *Layaou*). Further, the SPD is of such importance that "where the terms of a plan and the SPD conflict, the SPD controls." *Burke v. Kodak Ret. Income Plan,* 336 F.3d 103, 110 (2d Cir.2003); *see also Joyce v. Curtiss–Wright Corp.,* 171 F.3d 130, 135–36 (2d Cir.1999) ("Employers are bound by promises made in SPDs, which Congress intended to be a primary source of information regarding plan benefits."). Since the terms of the phantom account were neither included in the 1989 Restatement nor included in the Plan's SPDs up through 1994, we disagree that the Plan has always contained the phantom account or that its existence was adequately disclosed. It is clear, under either an arbitrary or capricious standard or as a matter of law, that the Plan administrator's conclusion that

the Plan always included the phantom account is unreasonable.[11]

Because we find that the Plan did not always include the phantom account, it follows that the various changes, updates and explanations from the Plan regarding the existence and nature of the phantom account are not mere clarifications of an existing policy. Rather, they had the effect, whether deliberate or unintentional, of engrafting the phantom account onto the Plan without actually amending its text.

### 2. Amendment of the Plan to Include the Phantom Account

Having considered and rejected the defendants' other arguments in favor of the lawfulness of the phantom account, we are left only to consider whether the phantom account was adopted pursuant to a valid amendment of the Plan. The district court found that the Plan was validly amended by 1995 when the Benefits Update, which explained in some detail how the phantom account functions, was issued. It reasoned that even if prior notice was not given, by 1995 the plaintiffs received sufficient "tardy notice" of the phantom account offset to satisfy the requirements of § 204(h). *Frommert 2004*, 328 F.Supp.2d at 435–36. This conclusion was based in part on the court's rationale that the plaintiffs could not demonstrate that they had suffered any prejudice as a result of the imposition of the phantom account, which the district court concluded was demonstrated by the fact that they had all decided to remain at Xerox even after disclosure of the phantom account offset and its effects. *Id.* at 436.

Section § 204(h), as it then existed, clearly required the Plan administrators to provide fifteen days advance notice of any amendment creating "a significant reduction in the rate of *future* benefit accrual." ERISA § 204(h), 29 U.S.C. § 1054(h) (emphasis added); *see also Prod. & Maint. Employees' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1404 (7th Cir.1992) ("Section 204(h)'s language is also clear and imperative: a plan 'may not be amended' absent proper notice."). Allowing "tardy notice" several years after the effective date of an amendment to stand in for the advance notice that is actually required under § 204(h) upends the purpose of the provision by turning "future benefit accrual" into past accrual. Under the district court's approach, by the time the plaintiffs learned of the phantom account, some of them had already experienced at least five years—from the 1989 Restatement until the 1995 Benefits Update—of significantly reduced benefit accrual. As a result, they were deprived of the opportunity to take timely action in response to the purported "amendment." Such action might have included seeking injunctive relief, altering their retirement investment strategies, or perhaps considering other employment.

11. It is not settled whether a *de novo* or arbitrary and capricious standard of review applies. In *Layaou*, the court found "as a matter of law, that the SPD failed to provide notice to Layaou and other similarly situated employees that their future benefits would be offset by an appreciated value of their prior lump-sum benefits distributions." *Layaou*, 238 F.3d at 210. The *Layaou* court further stated that the plan administrator's interpretation that the plan always included the phantom account was unreasonable "under either an arbitrary and capricious or de novo standard of review" and noted that "[i]n reaching this conclusion, we express no view on whether the deferential standard of review for a plan administrator's interpretation of a plan under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), is applicable to a plan administrator's interpretation of an SPD, where it has been determined that the SPD violates the disclosure requirements of 29 U.S.C. § 1022." *Id.* at 211–12. Here, as in *Layaou*, we find the Plan Administrator's conclusion to be unreasonable under either standard.

■ That the plaintiffs remained employed at Xerox after belatedly learning of the effects of the phantom account cannot excuse the Plan's attempts to impermissibly amend the Plan. Contrary to the defendants' arguments and the district court's conclusion, the fact that the plaintiffs remained in Xerox's employ does not demonstrate that they suffered no prejudice through the purported adoption of the phantom account offset. Imposing a requirement that plan participants must show actual prejudice from a challenged plan amendment by terminating their employment imposes an unduly harsh burden on dissatisfied plan participants. This Court has rejected such a standard in the context of plan participants challenging deficient SPDs. *Burke*, 336 F.3d at 112. Rather than showing actual prejudice, we held that plan participants must demonstrate that they were "likely to have been harmed" by the faulty SPD. *Id.* at 113. In this case, we find that the plaintiffs have met this standard. The prolonged absence of any mention of the phantom account from Plan documents, most notably SPDs, likely, and quite reasonably, led plan participants to believe that it was not a component of the Plan. Rather, rehired employees likely believed that their past distributions would only be factored into their benefits calculations by taking into account the amounts they had actually received.

While an employer may rebut a showing of likely prejudice by demonstrating that the deficiency was in fact a harmless error, *id.,* that has not occurred here. The assumption that the employees were not prejudiced because they remained in their positions after learning of the phantom account does not lead to the conclusion that it was merely a harmless error. In fact, such a conclusion can only be reached if all of the other important aspects of a job are put to the side and pension benefits are made the determinative factor in whether a position is desirable. While there is no doubting the importance of achieving security for retirement, many other weighty considerations bear on the decision whether to continue or terminate employment, including salary, seniority, and, not least of all, job satisfaction. In this case, these considerations are particularly relevant where purported notice of an amendment came some five years after the effective date of the purported amendment. In the interim, the plaintiffs continued to be employed by Xerox and presumably reaped the attendant benefits of prolonged employment, such as increasing seniority, responsibility and salary. Thus it cannot be reasonably concluded that the plaintiffs somehow waived their right to object to the surreptitious imposition of the phantom account by remaining at Xerox.

■ We also disagree with the district court's conclusion that the 1995 Benefits Update effectively amended the terms of the Plan. While the substance of the Benefits Update made clear the "full import" of the phantom account, *Layaou*, 238 F.3d at 211, its form was insufficient to effectively amend the text of the Plan. Although the district court labeled the Benefits Update an SPD, we conclude instead that it was insufficiently "accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan," 29 U.S.C. § 1022(a), to be an SPD. As the Benefits Update itself indicates, it was only intended to summarize changes to the Plan and offer "clarification of key points about the plans." Such "corporate literature" cannot take the place of an SPD, from which plan participants are expected to draw their understanding of the terms of their plan. *See Burke*, 336 F.3d at 111.

Accordingly, we disagree with the district court that the 1995 Benefits Update provided timely notice under § 204(h). We also find that the 1998 Benefits Update violated the requirements of § 204(h) because, while the amendment adding the phantom account was fully disclosed, it was not preceded by fifteen days notice to Plan participants. Without such proper notice to Plan participants, the amendment was ineffective as to them.

### 3. The Impact of the Phantom Account

Having concluded that the phantom account was impermissibly added to the Plan with respect to employees rehired before 1998, we must consider the impact of the phantom account on these employees' benefits.

It is clear that the application of the phantom account reduced the amount of benefits on which the employees had justifiably relied. The district court's conclusion that the phantom account serves only to allow a comparison between the TRA and CBRA accounts and the RIGP benefit, while perhaps correct in a hyper-technical sense, overlooks the ultimate effect of that comparison. By including a large amount of hypothetical growth in a nonexistent account, the comparison among the three accounts is skewed in favor of selecting either the TRA or CBRA over the RIGP as the basis for payment. However, once either the TRA or CBRA is selected as providing the highest amount of benefits, the phantom account value is taken out, leaving a benefit amount significantly less than what the RIGP would provide. Thus, although the application of the phantom account does not directly deplete an employee's pension account, by altering the comparative process, it imposes a condition on the payment of benefits that leads just as surely to a decrease. See Cent. Laborers', 541 U.S. at 744–45, 124 S.Ct. 2230.

Indeed, on remand in a Western District of New York case involving this same Plan, the court reached this exact conclusion when assessing the impact of the phantom account on the plaintiff's benefits: "It resulted in a significant reduction in plaintiff's benefits, compared to what he would have received without the offset . . . ." Layaou v. Xerox Corp., 330 F.Supp.2d 297, 303 (W.D.N.Y.2004).

We find that this reduction of justified expectations of benefits took the form of a retroactive cut-back in violation of § 204(g). Employees rehired prior to 1998 worked and accrued benefits under a Plan that did not provide for reduction of their benefits by factoring in the hypothetical value of a phantom account. However, once the phantom account was purportedly added, the value of an employee's accrued benefits were reduced significantly. The impact is demonstrated through the disparity between the RIGP benefits of $2,842 that Frommert was informed he would receive in his 1996 Value Added statement and the ultimate value of $5.31 that was calculated for his TRA account once the phantom account was applied.

On remand, the remedy crafted by the district court for those employees rehired prior to 1998 should utilize an appropriate pre-amendment calculation to determine their benefits. We recognize the difficulty that this task poses because of the ambiguous manner in which the pre-amendment terms of the Plan described how prior distributions were to be treated. As guidance for the district court, we suggest that it may wish to employ equitable principles when determining the appropriate calculation and fashioning the appropriate remedy.

### 4. The 1998 SPD

As we have indicated above, the 1998 SPD amended the text of the Plan to

include the phantom account and comparative methodology by fully setting out how they are used to calculate rehired employees' benefits. Indeed, the plaintiffs agreed during oral argument before the district court that the 1998 SPD adequately describes the offset procedure. Appendix at 1803. Employees hired after this amendment to the Plan occurred, unlike those rehired before then, became Plan participants under the terms of the amended Plan. As such, the phantom account may permissibly be applied to them. With full notice of the phantom account's existence, these rehired employees, unlike their predecessors who lacked such information, had the opportunity to make an informed decision about taking or leaving the terms of the deal offered to them under the Plan.[12]

On remand, it will be necessary for the district court to determine which of the plaintiffs were rehired by Xerox after the Plan was amended to include the phantom account and thus can be bound by its terms.

### B. Availability of Equitable Relief

Plaintiffs also appeal the dismissal of their claims for equitable relief under the "catch-all" provision of ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). The equitable relief sought by the plaintiffs under this provision comes in two parts. First, they seek a declaration that the phantom account violates ERISA and an injunction against its future use. Second, they seek to bring a claim for breach of fiduciary duty by the plan administrators.[13] The

district court dismissed both aspects of this claim because it concluded that all of the relief sought by the plaintiffs could be adequately provided under § 502(a)(1)(B). *Frommert 2002*, 206 F.Supp.2d at 439; *Frommert 2004*, 328 F.Supp.2d at 438–39. With respect to the breach of fiduciary duty claim, the district court found in the alternative that the claim lacked merit because the plaintiffs had received notice of the phantom account by 1995 and, further, that the claim was time-barred. *Frommert 2004*, 328 F.Supp.2d at 439. We consider these issues in turn, affirming the district court as to the denial of equitable relief to pursue money damages and vacating the district court's judgment concerning the availability of § 502(a)(3) to state a claim for breach of fiduciary duties against the Plan administrators.

### 1. Equitable Relief to Pursue Payment of Benefits

■ On appeal, the plaintiffs contend that although they ultimately seek money damages through recalculation of their pension benefits, the "vehicle" for such relief is a judgment declaring that the phantom account is prohibited by ERISA and enjoining its application in calculating the benefits of any Plan participants. Because we have determined that such sweeping relief is not warranted, we conclude that the necessary remedies can be fully provided under § 502(a)(1)(B). Thus, we affirm the decision of the district court as to this portion of the plaintiffs' claim for equitable relief.

---

12. Unlike employees rehired before the 1998 SPD was issued, those hired after it was provided were not "participant[s] in the plan" at the time of the change required to be notified under § 204(h).

13. As the district court noted, the plaintiffs did not identify a statutory basis for the sec-

ond component of the equitable relief that they seek. However, claims by plan participants for breach of fiduciary duties arise under § 502(a)(3). *See Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 89 (2d Cir.2001).

The relief that the plaintiffs seek, recalculation of their benefits consistent with the terms of the Plan, falls comfortably within the scope of § 502(a)(1)(B), which allows a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Because adequate relief is available under this provision, there is no need on the facts of this case to also allow equitable relief under § 502(a)(3). *See Johnson v. Buckley,* 356 F.3d 1067, 1077 (9th Cir.2004) ("when relief is available under section 1132(a)(1), courts will not allow relief under § 1132(a)(3)'s 'catch-all provision.' ").

This issue has been addressed by the Supreme Court, which has consistently disfavored the expansion of the availability of equitable relief where remedies at law are sufficient. In *Varity Corp. v. Howe,* 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the Court concluded that §§ 502(a)(3) and (5), the section's "catchall" provisions, "act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." It also observed that "we should expect that where Congress provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.' " *Id.* at 515, 116 S.Ct. 1065. In *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), the Court, in denying the availability of relief under § 502(a)(3), sounded a note of caution concerning suits purporting to seek equitable relief while also seeking monetary damages:

> 'Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are

suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.' *Bowen v. Massachusetts,* 487 U.S. 879, 918–919, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (SCALIA, J., dissenting). And 'money damages are, of course, the classic form of *legal* relief.' [*Mertens v. Hewitt Associates,* 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) ].

While the plaintiffs seek to expand the nature of their claim by couching it in equitable terms to allow relief under § 502(a)(3), the gravamen of this action remains a claim for monetary compensation and that, above all else, dictates the relief available. *See Gerosa v. Savasta & Co., Inc.,* 329 F.3d 317, 321 (2d Cir.2003) ("In determining the propriety of a remedy, we must look to the real nature of the relief sought, not its label.") (citations omitted).

### 2. Breach of Fiduciary Duty

The plaintiffs allege that the defendants breached their fiduciary duty to Plan participants by publishing and supplying misleading information in SPDs, annual Personal Benefits Statements and in response to the plaintiffs' requests for clarification of their rights under the Plan. The district court dismissed this breach of fiduciary duty claim, finding it to be duplicative of the claim for equitable relief under § 502(a)(3) that it had already dismissed. The district court also concluded that this claim lacked merit because the Plan participants were made fully aware of the phantom account by 1995, a fact that it concluded made the claim untimely because the original complaint was filed in 1999, beyond the three year statute of limitations applicable to such a claim. *Frommert 2004,* 328 F.Supp.2d at 438–39. We dis-

agree with these conclusions and vacate the district court's judgment as to this portion of the plaintiffs' claim under § 502(a)(3).

■ First, we cannot agree with the district court's conclusion that the breach of fiduciary duty claim lacks merit as a matter of law. As a preliminary matter, we note that "whether a person is a fiduciary in a particular situation is a question of law and fact." *Gray v. Briggs,* No. 97 Civ. 6252, 1998 WL 386177 (S.D.N.Y. July 7, 1998) (citing *LoPresti v. Terwilliger,* 126 F.3d 34, 39–40 (2d Cir.1997)). Here, however, the district court did not reach the threshold issue of whether the defendants acted as fiduciaries under ERISA because the court dismissed the Plaintiffs' breach of fiduciary duty claim as time barred and duplicative. *See Frommert 2004,* 328 F.Supp.2d at 438–39.

■ Although we cannot conclude as a matter of law based on the record before us whether the defendants had fiduciary obligations under ERISA and if so whether they breached them, we conclude that there is a triable issue of fact on these questions. We therefore remand to the district court for further proceedings on this issue.

ERISA provides that a " 'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan." *Varity Corp.,* 516 U.S. at 498, 116 S.Ct. 1065 (quoting

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A)). This court has recognized Congress's intention that ERISA's definition of fiduciary be broadly construed. *See LoPresti v. Terwilliger,* 126 F.3d 34, 40 (2d Cir.1997) (citing *Blatt v. Marshall & Lassman,* 812 F.2d 810, 812 (2d Cir.1987)). "Unlike the common law definition under which fiduciary status is determined by virtue of the position a person holds, ERISA's definition is functional." *LoPresti,* 126 F.3d at 40 (internal citation omitted).

The district court, in dismissing plaintiffs' breach of fiduciary duty claim as duplicative and time barred, stated in dicta that "this claim, which is based largely on defendants' alleged failure to disclose the existence of the phantom account offset is meritless." The court made no findings of fact concerning whether defendants acted in a fiduciary capacity towards the plaintiffs. *Cf. Varity Corp.,* 516 U.S. at 498, 116 S.Ct. 1065 ("In reviewing [the district court's] legal conclusion [that the defendant acted as fiduciary], we give deference to the factual findings of the District Court, recognizing its comparative advantage in understanding the specific context in which the events of this case occurred.").

We therefore remand to the district court for further proceedings on these questions.[14] On remand, the district court should permit a trier of fact to assess (1) whether the defendants acted in a fiduciary capacity when they communicated with the Plan's beneficiaries about the implementation of the phantom account, and (2) whether those communications contained

---

**14.** In *Devlin v. Empire Blue Cross & Blue Shield,* this court also instructed that on remand "the district court should permit a trier of fact to evaluate [the defendant's] communications with plaintiffs for affirmative misrepresentations regarding plan benefits and for

failure to provide completely accurate plan information," concluding that a "trier of fact could find that there was a fiduciary duty and that [defendant] breached it." 274 F.3d at 89.

affirmative misrepresentations of fact concerning the Plan or breached the defendants' duty to deal fairly with the Plan's beneficiaries.

Second, we disagree with the district court's conclusion that all of the relief sought by the plaintiffs in their claim for breach of fiduciary duties can be adequately addressed by the relief available under § 502(a)(1)(B). In *Devlin*, this Court considered whether the Supreme Court's decision in *Varity Corp.* foreclosed the availability of a private cause of action for breach of fiduciary duty under § 502(a)(3) when another potential remedy is available and held that it did not. 274 F.3d at 89–90. Rather, we held that responsibility for determining "appropriate equitable relief" rests with the district court. *Id.* at 89. That determination "must be based on ERISA policy and the 'special nature and purpose of employee benefits plans'," *id.* (quoting *Varity Corp.*, 516 U.S. at 515, 116 S.Ct. 1065), as well as consideration of the relief afforded the plaintiffs under their § 502(a)(1)(B) claim. Thus, we direct the district court that if the plaintiffs prevail on this claim, it must determine what "appropriate equitable relief" is necessary. Although the district court has previously addressed this issue and found no relief was necessary, in light of our holdings above, we direct that it reconsider the issue should the plaintiffs prevail on this claim.

■■■ Third, and finally, we reject the district court's findings that the plaintiffs' claim for breach of fiduciary duty was untimely. Under ERISA § 413, 29 U.S.C. § 1113, such a claim must be brought within "(1) six years after (A) the date of the last action which constituted a part of the breach ..." or "(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation," whichever is earlier. The district court found the claim to be untimely under § 413(2) because it determined that the three year statute of limitations began to run in 1995 when the Benefits Update disclosing the nature of the phantom account was issued. *Frommert 2004,* 328 F.Supp.2d at 439.

The flaw with the district court's conclusion is that the plaintiffs' claim for breach of fiduciary duty is not premised solely on the defendants' adoption of the phantom account; rather, it is based on allegations that the defendants made ongoing misrepresentations about the origins of the phantom account in an effort to justify its usage. As a result, learning the manner in which the phantom account functions was not sufficient to provide "actual knowledge" that a breach of fiduciary duty had occurred. "[A] plaintiff has 'actual knowledge of the breach or violation' within the meaning of ERISA § 413(2), 29 U.S.C. § 1113(2), when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir.2001). Although the 1995 Benefits Update may have provided notice that the plaintiffs' benefits would be lower than they expected, it certainly did not inform the plaintiffs that the phantom account was being applied in contravention of the Plan's terms. Thus, while the Benefits Update may have heightened the plaintiffs' concerns regarding their expected benefits, "it is not enough that [plaintiffs] had notice that something was awry; [plaintiffs] must have had specific knowledge of the actual breach of duty upon which [they sued]." *Id.* (alteration in original) (internal quotation marks and citation omitted). Such knowledge of an actual breach could only come with disclosure of the fact that the defendants misrepresented the terms

of the Plan in justifying the usage of the phantom account.

Accordingly, the district court erred in holding that the three-year statute of limitations began to run when the 1995 BENEFITS Update was issued. On remand, the district court is directed to determine when the plaintiffs had actual knowledge of the alleged breach of the defendants' fiduciary duties.

## III. Conclusion

For the foregoing reasons, we VACATE the judgments dismissing this action, except as to the anti-forfeiture claim under § 203(a)(2) and the claim for a declaratory judgment and an injunction under § 502(a)(3), which we affirm, and REMAND for further proceedings consistent with this opinion.