Justice Breyer,
with whom Justice Stevens and Justice Ginsburg join, dissenting.
I agree with the Court that “[pjeople make mistakes,” ante, at 509, but I do not share its view of the law applicable to those mistakes. To explain my view, I shall describe the three significant mistakes involved in this case.
*523 I
A
The first mistake is that of Xerox Corporation’s pension plan (Plan) and its administrators (collectively, Plan Administrator or Administrator), petitioners here. The Plan, as I understand it, pays employees the highest of three benefits upon retirement. App. 29a-31a. These benefits are calculated as follows (I simplify and use my own words, not those of the Plan):
(1) “The Pension”: Take your average salary for your five highest salary years at Xerox; multiply by 1.4 percent; and multiply again by the number of years you worked at Xerox (up to 30). Id., at 7a-lla, 29a-30a. Thus, if the average salary of your five highest paid years was $50,000 and you worked at Xerox for 30 years, you would be entitled to receive $21,000 per year ($50,000 x 1.4 percent x 30).
(2) “The Cash Account”: Every year, Xerox credits 5 percent of your salary to a cash account. Id., at 40a. This account accrues interest at a yearly fixed rate 1 percent above the 1-year Treasury bill rate. Id., at 41a. To determine your benefits under this approach, take the balance of your cash account, and convert the final amount to an annuity. Id., at 31a. Thus, if you have accrued, say, $200,000 in your account, and the relevant annuity rate at the time of your retirement is 7 percent, you would be entitled to receive approximately $14,000 per year upon your retirement (approximately $200,000 x 7 percent).
(3) “The Investment Account”: Before 1990, Xerox contributed to an employee profit-sharing plan. Id., at 33a-34a. Thus, all employees who were hired by the end of 1989 have an investment account that consists of all of the contributions Xerox made to this profit-sharing plan (prior to its discontinuation) and the investment *524 returns on those contributions. Id., at 33a-36a. To determine your benefits under this approach, take the balance of your investment account, and convert the final amount to an annuity. Id., at 31a. Thus, just like the cash account, if you have accrued $400,000 in your account, and the relevant annuity rate at the time of your retirement is 7 percent, you would be entitled to receive approximately $28,000 per year upon your retirement (approximately $400,000 x 7 percent).
Given these three examples, the retiring employee’s pension would come from the investment account, and the employee would receive $28,000 per year.
This case concerns one aspect of Xerox’s retirement plan, namely, the way in which the Plan treats employees who leave Xerox and later return, working for additional years before their ultimate retirement. The Plan has long treated such leaving-and-returning employees as follows (again, I simplify and use my own words):
First, when an employee initially leaves, she is paid a lump-sum distribution equivalent to the benefits she has accrued up to that point (i. e., the highest of her pension, her cash account, or, if she was hired before the end of 1989, her investment account). See ante, at 510.
Second, when the employee returns, she again begins to accrue amounts in her cash account, App. 40a-41a, starting from scratch. (She accrues nothing in her investment account, because Xerox no longer makes profit-sharing contributions. Id., at 34a.) Thus, by the time of her retirement the employee may not have accrued much money in this account.
Third, a rehired employee’s pension is calculated in the way I have set forth above, with her entire tenure at Xerox (both before her departure and after her return) taken into account. See Brief for Petitioners 9-10.
Fourth, the employee’s benefits calculation is adjusted to take account of the fact that the employee has already re *525 ceived a lump-sum distribution from the Plan. See App. 32a; Brief for Petitioners 10-11.
This case is about the adjustment that takes place during step four. It concerns the way in which the Plan Administrator calculates that adjustment so as to reflect the fact that a retiring leaving-and-returning employee has already received a distribution when she initially left Xerox. Before 1989, the Plan Administrator calculated the adjusted amount by taking the benefits distribution previously received (say, $100,000) and adjusting it to equal the amount that would have existed in the investment account had no distribution been made. Ibid. Thus, if an employee had not left Xerox, and if the $100,000 had been left in her investment account for, say, 20 years, that amount would likely have increased dramatically — perhaps doubling, tripling, or quadrupling in amount, depending upon how well the Plan’s investments performed.
It is this hypothetical sum — termed the “phantom account,” ante, at 510 — that is at issue in this case. Xerox’s pre-1989 Plan assumed that a rehired employee had this hypothetical sum on hand at the time of her final retirement from the company, and in effect subtracted the amount from the employee’s benefits upon her departure. Brief for Petitioners 10-11; cf. ante, at 510. Depending on how the Plan’s investments did over time, the Administrator’s use of this “phantom account” could have a substantial impact on a rehired employee’s benefits. (See Appendix, infra, for an example of how this “phantom account” works.)
When the Plan Administrator amended Xerox’s Employee Retirement Income Security Act of 1974 (ERISA) Plan in 1989, however, it made what it tells us was an “inadverten[t]” omission. Brief for Petitioners 11, n. 3. In a section of the 1989 Plan applicable to the roughly 100 leaving-and-returning employees who are plaintiffs here, the Plan said that it would “offset” the retiring employees’ “accrued benefit” (as ordinarily calculated) “by the accrued benefit attrib *526 utable” to the prior lump-sum “distribution” those employees received when they initially left Xerox. App. 32a. But the Plan said nothing about how it would calculate this “offset. ” In other words, the Plan said nothing about the Administrator’s use of the “phantom account.”
This led to the first mistake in this case. Despite the Plan’s failure to include language explaining how the Administrator would take into account an employee’s prior distribution, the Plan Administrator continued to employ the “phantom account” methodology. In essence, the Administrator read the 1989 Plan to include the language that had been omitted — an interpretation that, as described below, see Part I-B, infra, the Court of Appeals found to be arbitrary and capricious and in violation of ERISA.
B
The District Court committed the second mistake in this case. In 1999, respondents, nearly 100 employees who left and were later rehired by Xerox, brought this lawsuit. Ante, at 510; Brief for Petitioners ii-iii, 12. They pointed out that the 1989 Plan said that it would decrease their retirement benefits to reflect the fact that they had already received a lump-sum benefits distribution when they initially left Xerox. But, they added, neither the 1989 Plan, nor the 1989 Plan’s Summary Plan Description, said anything about whether (or how) the Administrator would adjust their previous benefits distribution to take into account that they had received the distribution well before their retirement. They thus claimed that the Plan Administrator could not use the “phantom account” methodology to adjust their previous distributions. See Brief for United States as Amicus Curia/e 4-5.
The District Court, however, rejected respondents’ claims. 328 F. Supp. 2d 420 (WDNY 2004). The court accepted the Administrator’s argument that the 1989 Plan implicitly incorporated the “phantom account” approach that had previously *527 been part of Xerox’s retirement plan. Id., at 433-434. And the court thus held in favor of petitioners — thereby committing the second mistake in this case. Id., at 439.
On appeal, the Second Circuit disagreed with the District Court and vacated the District Court’s decision in relevant part. 433 F. 3d 254 (2006). The Court of Appeals concluded that, because the 1989 Plan said nothing about how the Administrator would adjust the previous benefits distributions, it was “arbitrary and capricious” for the Administrator to interpret the 1989 Plan as if it still incorporated the “phantom account.” Id., at 265-266, and n. 11. And the Court of Appeals thus held that the language of the Plan and the Summary Plan Description, at the least, violated ERISA by failing to provide respondents with fair notice that the Administrator was going to use the “phantom account” approach. See id., at 265 (discussing 29 U. S. C. § 1022); see also 433 F. 3d, at 263, 267-268 (holding that the Administrator’s attempt to apply the “phantom account” to respondents violated two other ERISA provisions: 29 U. S. C. § 1054(h)’s notice requirement and § 1054(g)’s prohibition on retroactive benefit cutbacks). Rather, the court noted, respondents “likely believed” — based on the language of the Plan — “that their past distributions would only be factored into their [current] benefits calculations by taking into account the amounts they had actually received.” 433 F. 3d, at 267.
In light of these conclusions, the Court of Appeals recognized the need to devise a remedy for the Administrator’s abuse of discretion and ERISA violations — a remedy that took into account the previous benefits distributions respondents had received in a manner consistent with the 1989 Plan. The court therefore remanded the case to the District Court, with the following instructions:
“On remand, the remedy crafted by the district court for those employees [in the respondents’ situation] should utilize an appropriate [pre-1989 Plan] calculation to determine their benefits. We recognize the difficulty *528 that this task poses .... As guidance for the district court, we suggest that it may wish to employ equitable principles when determining the appropriate calculation and fashioning the appropriate remedy.” Id., at 268.
On remand, the District Court invited the parties to submit remedial recommendations. Brief for Petitioners 14. The Plan Administrator proposed an approach that would adjust respondents’ previous benefits distributions by adding interest, and, as a fallback, the Administrator suggested that the Plan should treat respondents as new hires. Ante, at 510-511; Brief for United States as Amicus Curiae 6-7. The District Court rejected these suggestions and concluded that the “appropriate” remedy was the one suggested by the Second Circuit: no adjustment to the prior distributions received by respondents. 472 F. Supp. 2d 452, 458 (WDNY 2007). The court stated that this remedy was “straightforward; it adequately prevent[ed] employees from receiving a windfall[;] and... it most clearly refleet[ed] what a reasonable employee would have anticipated based on the not-very-clear language in the Plan.” Ibid. And the Court of Appeals, finding that the District Court did not abuse its discretion in crafting a remedy, affirmed. 535 F. 3d 111 (CA2 2008).
II
The third mistake, I believe, is the Court’s. As the majority recognizes, ante, at 512, “principles of trust law” guide this Court in “determining the appropriate standard” by which to review the actions of an ERISA plan administrator. Firestone Tire & Rubber Co. v. Bruch, 489 U. S. 101, 111-113 (1989); see also Metropolitan Life Ins. Co. v. Glenn, 554 U. S. 105, 111 (2008); Aetna Health Inc. v. Davila, 542 U. S. 200, 218-219 (2004); Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U. S. 559, 570 (1985). And, as the majority also recognizes, ante, at 512, where an ERISA plan grants an administrator the discretionary authority to interpret plan terms, trust law requires *529 a court to defer to the plan administrator’s interpretation of plan terms. See, e. g., Glenn, supra, at 111. But the majority further concludes that trust law “does not resolve the specific issue before” the Court in this case — i. e., whether a court is required to defer to an administrator’s second attempt at interpreting plan documents, even after the court has already determined that the administrator’s first attempt amounted to an abuse of discretion. Ante, at 516. In my view, this final conclusion is erroneous, as trust law imposes no such rigid and inflexible requirement.
The Second Circuit found the Administrator’s interpretation of the Plan to be arbitrary and capricious and in violation of ERISA, and it made clear that the District Court's task on remand was to “craf [t]” a “remedy.” See 433 F. 3d, at 268. Trust law treatise writers say that in these circumstances a court may (but need not) exercise its own discretion rather than defer to a trustee’s interpretation of trust language. See G. Bogert & G. Bogert, Law of Trusts and Trustees §560, pp. 222-223 (2d rev. ed. 1980) (hereinafter Bogert & Bogert) (after finding an abuse of discretion, a court may “decid[e] for the trustee how he should act,” possibly by “stating the exact result” the court “desires to achieve”); see also 2 Restatement (Third) of Trusts §50, p. 258 (2001) (hereinafter Third Restatement) (“A discretionary power conferred upon the trustee ... is subject to judicial control only to prevent misinterpretation or abuse of the discretion by the trustee”); 1 Restatement (Second) of Trusts § 187, p. 402 (1957) (hereinafter Second Restatement) (“Where discretion is conferred upon the trustee ... , its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion”); see also Firestone, supra, at 111. Judges deciding trust law cases have said the same. See, e. g., Colton v. Colton, 127 U. S. 300, 322 (1888) (stating that it was the “duty of the court” to determine the trust payments due after rejecting the trustee’s interpretation); State v. Rubion, 158 Tex. 43, 55, 308 S. W. *530 2d 4, 11 (1957) (“Considering that we have held that there has already been an abuse of discretion by the trustee ..., we have concluded that a remand of the case to the trial court for the definite establishment of amounts to be paid will better promote a speedy administration of justice and a final termination of this litigation”); Glenn, supra, at 130 (Scalia, J., dissenting) (court may exercise discretion under trust law when a “trustee had discretion but abused it”). In short, the controlling trust law principle appears to be that, “[w]here the court finds that there has been an abuse of a discretionary power, the decree to be rendered is in its discretion.” Bogert & Bogert § 560, at 222.
Of course, the fact that trust law grants courts discretion does not mean that they will exercise that discretion in all instances. The majority refers to the 2007 edition of Scott on Trusts, ante, at 514, which says that, if there is “no reason” to doubt that a trustee “will . . . fairly exercise” his “discretion,” then courts “ordinarily will not fix the amount” of a payment “but will instead direct the trustee to make reasonable provision for the beneficiary’s support,” 3 A. Scott, W. Fratcher, & M. Ascher, Scott and Ascher on Trusts § 18.2.1, pp. 1348-1349 (5th ed. 2007) (hereinafter Scott) (emphasis added). As this passage demonstrates, there are situations in which a court will typically defer to a trustee’s remedial suggestion. The word “ordinarily” confirms, however, that the Scott treatise writers recognize that there are instances in which courts will not defer. And other treatises indicate that black letter trust law gives the district courts authority to decide which instances are which. See Bogert & Bogert § 560, at 222-223 (when there is an abuse of discretion, a court “may set aside the transaction,” “award damages to the beneficiary,” or “order a new decision to be made in the light of rules expounded by the court”); 2 Third Restatement § 50, and Comment b, at 261 (discussing similar remedial options); 1 Second Restatement §187, and Comment b, at 402 (same); see also 3 Third Restatement §87, and *531 Comment c, at 244-245 (noting that “judicial intervention on the ground of abuse” is allowed when a “good faith,” yet “unreasonable,” decision is made by a trustee); Rubion, supra, at 54-55, 308 S. W. 2d, at 11 (discussing a court’s remedial options).
Nevertheless, the majority reads the Scott treatise as establishing an absolute requirement that courts defer to a trustee’s fallback position absent “reason to believe that [the trustee] will not exercise [his] discretion fairly — for example, upon a showing that the trustee has already acted in bad faith.” Ante, at 514. And based on this reading, the majority further concludes that the existence of the Scott treatise creates uncertainty as to whether, under basic trust law principles, a court has the power to craft a remedy for a trustee’s abuse of discretion. Ante, at 514-516.
It is unclear to me, however, why the majority reads the passage from Scott as creating a war among treatise writers, compare ante, at 514 (discussing Scott), with ante, at 515-516 (discussing Bogert), when the relevant passages can so easily be read as consistent with one another. I simply read the Scott treatise language as identifying circumstances in which courts typically choose to defer to an administrator’s fallback position. The treatise does not suggest that the law prohibits a court from acting on its own in the exercise of its broad remedial authority — authority that trust law plainly grants to supervising courts. See supra, at 530.
A closer look at the Scott treatise confirms this understanding. The treatise cites seven cases in support of the passage upon which the majority relies. See 3 Scott § 18.2.1, at 1349, n. 4. Three of these cases explicitly state that a court may exercise its discretion to craft a remedy if a trustee has previously abused its discretion. See Old Colony Trust Co. v. Rodd, 356 Mass. 584, 589, 254 N. E. 2d 886, 889 (1970) (“A court of equity may control a trustee in the exercise of a fiduciary discretion if it fails to observe standards of judgment apparent from the applicable instrument”); *532 In re Estate of Marré, 18 Cal. 2d 184, 190, 114 P. 2d 586, 590-591 (1941) (“It is well settled that the courts will not attempt to exercise discretion which has been confided to a trustee unless it is clear that the trustee has abused his discretion in some manner” (emphasis added)); In re Estate of Ferrall, 92 Cal. App. 2d 712, 716-717, 207 P. 2d 1077, 1079-1080 (1949) (following In re Estate of Marré). Three other cases are inapposite because their circumstances do not involve any allegation of abuse of discretion by the trustee. See In re Trusts of Ziegler, 157 So. 2d 549, 550 (Fla. App. 1963) (per curiam) (“There is no contention here that the court... would not retain its rights, upon appropriate petition or other pleadings by an interested party, to review an alleged abuse, if any, of the discretion exercised by the trustees”); In re Estate of Grubel, 37 Misc. 2d 910, 911, 235 N. Y. S. 2d 21, 23 (Surr. Ct. 1962) (stating that “in the first instance” it is the “proper function of the trustees” to set an amount to be paid (emphasis added)); Orr v. Moses, 94 N. H. 309, 312, 52 A. 2d 128, 130 (1947) (declining to construe will because none “of the parties now assert claims adverse to any position taken by the trustee”). In the final case, the court decided that, on the facts before it, it did not need to control the trustees’ discretion. See In re Estate of Stillman, 107 Misc. 2d 102, 111, 433 N. Y. S. 2d 701, 708 (Surr. Ct. 1980) (“The fine record of the trustees in enhancing the equity of these trusts while earning substantial income, also persuades the court of the wisdom of retaining their services as fiduciaries”). Which of these cases says that, after the trustee has abused its discretion, a district court must still defer to the trustee? None of them do. I repeat: Not a single case cited by the Scott treatise writers supports the majority’s reading of the treatise.
The majority seeks to justify its reading of the Scott treatise by referring to four cases that Scott does not cite. See ante, at 514-515, n. 1. I am not surprised that the treatise does not refer to these cases. In the first three, a court *533 thought it best, when a trustee had not yet exercised judgment about a particular matter, to direct the trustee to do so. See In re Will of Sullivan, 144 Neb. 36, 40-41,12 N. W. 2d 148, 150-151 (1943) (finding that the trustees’ “failure to act” was erroneous, and directing the trustees to exercise their discretion in setting a payment amount); Eaton v. Eaton, 82 N. H. 216, 218, 132 A. 10, 11 (1926) (same); Finch v. Wachovia Bank & Trust Co., 156 N. C. App. 343, 347-348, 577 S. E. 2d 306, 309-310 (2003) (holding trustee erred by “[f]ail[ing] to exercise judgment,” and directing it to do so). The fourth case concerns circumstances so distant from those before us that it is difficult to know what to say. (The question was whether the beneficiary of a small trust had title in certain trust assets or whether the trustee had discretionary power to allocate them in her best interest; the court held the latter, adding that, if the trustee acted unreasonably, the lower court in that particular case should seek to have the trustee removed rather than trying to administer the trust funds itself.) See Hanford v. Clancy, 87 N. H. 458, 460-461, 183 A. 271, 272-273 (1936).
I cannot read these four cases, or any other case to which the majority refers, as holding that a court, as a general matter, is required to defer to a trust administrator’s second attempt at exercising discretion. And I am aware of no such case. In contrast, the Restatement and Bogert and Scott treatises identify numerous cases in which courts have remedied a trustee’s abuse of discretion by ordering the trustee to pay a specific amount. See 2 Third Restatement § 50, Reporter’s Note, at 283 (citing cases such as Coker v. Coker, 208 Ala. 354, 94 So. 566 (1922)); Bogert & Bogert § 560, at 223, n. 19 (citing cases such as Rubion); 3 Scott § 18.2.1, at 1348-1349, nn. 3-4 (citing cases such as Emmert v. Old Nat. Bank of Martinsburg, 162 W. Va. 48, 246 S. E. 2d 236 (1978)); see also Brief for United States as Amicus Curiae 18 (listing cases). I thus do not find trust law “unclear” on this matter. Ante, at 514. When a trustee abuses its discretion, trust law *534 grants courts the authority either to defer anew to the trustee’s discretion or to craft a remedy. See, e.g., 3 A. Scott & W. Fratcher, Scott on Trusts § 187, pp. 14-15 (4th ed. 1988) (“This ordinarily means that so long as [the trustee] acts not only in good faith and from proper motives, but also within the bounds of reasonable judgment, the court will not interfere; but the court will interfere when he acts outside the bounds of a reasonable judgment”).
Nor does anything in the present case suggest that the District Court abused its remedial authority. The Second Circuit stated that the interpretive problem on remand was in essence a remedial problem. See 433 F. 3d, at 268. It added that the remedial problem was “difficult]’’ and that “the district court... may wish to employ equitable principles when determining the appropriate calculation and fashioning the appropriate remedy.” Ibid. The Administrator had previously abused his discretionary power. Id., at 265-268. And the District Court found that the Administrator’s primary remedial suggestion on remand — adjusting respondents’ previous benefits distributions by adding interest— probably would have violated ERISA’s notice provisions. 472 F. Supp. 2d, at 457. Under these circumstances, the District Court reasonably could have found a need to use its own remedial judgment, rather than rely on the Administrator’s — which is just what the Second Circuit said. 535 F. 3d, at 119.
Moreover, even if the “narrow” trust law “question before us” were difficult, ante, at 514 — which it is not — this difficulty would not excuse the Court from trying to do its best to work out a legal solution that nonetheless respects basic principles of trust law. “Congress invoked the common law of trusts” in enacting ERISA, and this Court has thus repeatedly looked to trust law in order to determine “the particular duties and powers” of ERISA plan administrators. Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U. S., at 570-572; see also, *535 e. g., Glenn, 554 U. S., at 111; Davila, 542 U. S., at 218-219; Firestone, 489 U. S., at 111-113. While, as the majority recognizes, ante, at 516, trust law may “not tell the entire story,” Varity Corp. v. Howe, 516 U. S. 489, 497 (1996), I am aware of no other case in which this Court has simply ignored trust law (on the basis that it was unclear) and crafted a legal rule based on nothing but “the guiding principles we have identified underlying ERISA,” ante, at 516. See Varity, supra, at 497 (“In some instances, trust law will offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements” (emphasis added)).
In any event, it is far from clear that the Court’s legal rule reflects an appropriate analysis of ERISA-based policy. To the contrary, the majority’s absolute “one free honest mistake” rule is impractical, for it requires courts to determine what is “honest,” encourages appeals on the point, and threatens to delay further proceedings that already take too long. (Respondents initially filed this retirement benefits case in 1999.) See Glenn, 554 U. S., at 116-117. It also ignores what we previously have pointed out — namely, that abuses of discretion “arise in too many contexts” and “concern too many circumstances” for this Court “to come up with a one-size-fits-all procedural [approach] that is likely to promote fair and accurate” benefits determinations. Ibid. And, finally, the majority’s approach creates incentives for administrators to take “one free shot” at employer-favorable plan interpretations and to draft ambiguous retirement plans in the first instance with the expectation that they will have repeated opportunities to interpret (and possibly reinterpret) the ambiguous terms. I thus fail to see how the majority’s “one free honest mistake” approach furthers ERISA’s core purpose of “promoting] the interests of employees and their beneficiaries in employee benefit plans.” Shaw v. Delta Air Lines, Inc., 463 U. S. 85, 90 (1983); see also, e. g., *536 29 U. S. C. § 1001(b) (noting that ERISA was enacted “to protect . . . employee benefit plans and their beneficiaries”); Curtiss-Wright Corp. v. Schoonejongen, 514 U. S. 73, 83 (1995) (discussing ERISA’s central “goa[l]” of “enabling] plan beneficiaries to learn their rights and obligations at any time”); Massachusetts Mut. Life Ins. Co. v. Russell, 473 U. S. 134, 148 (1985) (ERISA was enacted “to protect contractually defined benefits”).
The majority does identify ERISA-related factors — e.g., promoting predictability and uniformity, encouraging employers to adopt strong plans — that it believes favor giving more power to plan administrators. See ante, at 517-521. But, in my view, these factors are, at the least, offset by the factors discussed above — e. g., discouraging administrators from writing opaque plans and interpreting them aggressively — that argue to the contrary. At best, the policies at issue — some arguing in one direction, some the other — are far less able than trust law to provide a “guiding principle.” Thus, I conclude that here, as elsewhere, trust law ultimately provides the best way for courts to approach the administration and interpretation of ERISA. See, e.g., Firestone, supra, at 111-113. And trust law here, as I have said, leaves to the supervising court the decision as to how much weight to give to a plan administrator’s remedial opinion.
III
Since the District Court was not required to defer to the Administrator’s fallback position, I should consider the second question presented, namely, whether the Court of Appeals properly reviewed the District Court’s decision under an “abuse of discretion” standard. Ante, at 511 (acknowledging, but not reaching, this issue). The answer to this question depends upon how one characterizes the Court of Appeals’ decision. If the court deferred to the District Court’s interpretation of Plan terms, then the Court of Appeals most likely should have reviewed the decision de novo. See Fire *537 stone, supra, at 112; cf. Davila, supra, at 210 (“Any dispute over the precise terms of the plan is resolved by a court under a de novo review standard”). If instead the Court of Appeals deferred to the District Court’s creation of a remedy, in significant part on the basis of “equitable principles,” then it properly reviewed the District Court decision for “abuse of discretion.” See, e. g., Cook v. Liberty Life Assurance Co. of Boston, 320 F. 3d 11, 24 (CA1 2003); Zervos v. Verizon N. Y., Inc., 277 F. 3d 635, 648 (CA2 2002); Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F. 3d 1154, 1163 (CA9 2001); Halpin v. W. W. Grainger, Inc., 962 F. 2d 685, 697 (CA7 1992).
The District Court opinion contains language that supports either characterization. On the one hand, the court wrote that its task was to “interpret the Plan as written.” 472 F. Supp. 2d, at 457. On the other hand, the court said that “virtually nothing is set forth in either the Plan or the [Summary Plan Description]” about how to treat prior distributions; and, in describing its task, it said that the Court of Appeals had directed it to use “equitable principles” in fashioning a remedy. Ibid. Ultimately, the District Court appears to have used both the Plan language and equitable principles to arrive at its conclusion. See id., at 457-459.
The Court of Appeals, too, used language that supports both characterizations. Compare 535 F. 3d, at 117 (noting that the District Court “applied [Plan] terms” in crafting its remedy), with id., at 117-119 (describing the District Court’s decision as the “eraft[ing]” of a “remedy” and acknowledging that it had directed the District Court to use “equitable principles” in doing so). But the Court of Appeals ultimately treated the District Court’s opinion as if it primarily created a fair remedy. Ibid. Given the prior Court of Appeals opinion’s language, supra, at 527-528 (quoting 433 F. 3d, at 268), I believe that view is a fair, indeed a correct, view. And I consequently believe the Court of Appeals properly reviewed the result for an “abuse of discretion.”
*538 Petitioners argue that, because respondents were seeking relief under 29 U. S. C. § 1132(a)(1)(B), the Court of Appeals was, in effect, prohibited from treating the remedy as anything other than an application of a plan’s terms. Brief for Petitioners 55-56; Reply Brief for Petitioners 3, 16-17, and n. 8. While this provision allows plaintiffs only to “enforce” or “clarify” rights or to “recover benefits” “under the terms of the plan,” § 1132(a)(1)(B) (emphasis added), it does not so limit a court’s remedial authority, Great-West Life & Annuity Ins. Co. v. Knudson, 534 U. S. 204, 221 (2002) (In § 1132(a)(1)(B), “Congress authorized ‘a participant or beneficiary’ to bring a civil action . . . without referencfing] whether the relief sought is legal or equitable”). The provision thus does not prohibit a court from shaping relief through the application of equitable principles, as trust law plainly permits. See, e. g., 2 Third Restatement § 50, and Comment b, at 261 (discussing remedial options); Bogert & Bogert §870, at 123-126 (2d rev. ed. 1995). Indeed, a court that finds, for example, that an administrator provided employees with inadequate notice of a plan’s terms (as was true here) may have no alternative but to rely significantly upon those principles. Cf. 29 U. S. C. § 1104(a)(1)(D) (plan fiduciary must “discharge his dut[y] ... in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent” with ERISA).
For these reasons I would affirm the decision of the Court of Appeals. And I therefore respectfully dissent from the majority’s contrary determination.
APPENDIX
The “Phantom Account”
This Appendix provides a simplified and illustrative example of, as I understand it, how the “phantom account” works. For the purposes of this Appendix, I make the following assumptions: John worked at Xerox for 10 years from 1970 to *539 1980. At the time of his departure from Xerox, he was issued a lump-sum benefits distribution of $140,000. He was then rehired in January 1989, and he worked for Xerox for five more years before retiring (until December 1993), earning $50,000 each year of his second term of employment. I also assume that (1) Xerox’s contribution to John’s investment account was $2,500 in 1989 (the last year such accounts were offered), (2) Xerox’s contributions to John’s cash and investment accounts are always made on the final day of the year, (3) the rate of return in John’s cash and investment accounts is always 5 percent, and (4) annuity rates are also always 5 percent. (For the sake of simplicity, I treat all annuities as perpetuities, meaning that I calculate the present value of the annuities thusly: Present Value = Annual Payment/Annuity Rate.)
Given the above assumptions, John’s pension upon his retirement would be $10,500 per year ($50,000 x 1.4 percent x 15 years), which has a present value of $210,000 ($10,500 -s- 5 percent). John’s cash and investment accounts at the end of his fifth year would look as follows (While Xerox’s ERISA Plan did not include cash accounts until 1990, each employee’s opening cash account balance was credited with the balance of his investment account at the end of 1989. The figures for John’s cash account in 1989 thus reflect the performance of his investment account. In addition, all numbers are rounded to the nearest hundred):
[[Image here]]
*540 Now, as far as I understand it, John’s retirement benefits are calculated as follows, see 433 F. 3d, at 260:
First, the Plan Administrator would choose which of John’s three accounts would yield him the greatest benefits. In making this comparison, the Plan Administrator would assume that John had never left Xerox when calculating John's pension. The Plan Administrator would also assume, when calculating the value of John’s cash and investment accounts, that the lump-sum distribution John had received from Xerox had remained invested in his accounts. (In other words, the Plan Administrator would include the “phantom account” in his calculations. The total value of this phantom account in 1989, when John rejoined Xerox, is equal to John’s lump-sum distribution of $140,000 x 1.059, or approximately $217,200.)
The Plan Administrator would thus compare John’s pension, column D, and column H to determine John’s benefit. As you can see above, column H provides the greatest benefit, so John’s cash account would be used to calculate the benefits he would receive upon retirement.
Second, the Plan Administrator would “offset” John’s prior distribution against his current benefits to determine the amount of benefits John would actually receive. Thus, the Plan Administrator would take the “total” value of John’s cash account, including the “phantom account” ($277,800), and subtract out the value of the “phantom account” ($264,000). The total present value of the benefits John would receive upon his second retirement would thus be $13,800.
This means that John would receive approximately $690 annually ($13,800 x 5 percent) upon retirement under the Plan Administrator’s “phantom account” approach. In comparison, if John had simply been treated as a new employee when he was rehired, his pension would have entitled him to at least $3,500 annually ($50,000 x 1.4 percent x 5 years) upon his retirement. And the impact of the “phantom account” *541 may have been even more dramatic with respect to some of the respondents in this case. See Brief for Respondents 24 (describing how respondent Paul Frommert erroneously received a report claiming that his retirement benefits were $2,482.00 per month, before later discovering that, because of the “phantom account,” his actual monthly pension was $5.31 per month); see also App. 63a.